# SKINNER & EDDY CORPORATION *v.* UNITED STATES ET AL.

## APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF OREGON.

No. 215.  Argued March 11, 1919.—Decided May 5, 1919.

Where a suit to enjoin the enforcement of an order of the Interstate Commerce Commission is based upon the ground that the order exceeded the statutory powers of the Commission and, hence, is void, the courts may entertain jurisdiction notwithstanding no attempt has been made by the plaintiff to obtain redress from the Commission itself.  P. 562.

Where rates allowed by the Commission in a proceeding initiated by carriers for relief from the long and short haul clause were later increased as a result of orders made when the proceeding was reopened on the application of a state commission and a merchants association, *held,* that the new orders were to be regarded as resting upon the original petition of the carriers, so that, under the jurisdictional Act of October 22, 1913, a suit to enjoin their enforcement was properly brought in a judicial district where one of the carriers, a party defendant, had its residence.  P. 563.

The clause in § 4 of the Commerce Act, as amended June 18, 1910, providing that when a railroad carrier shall, in competition with a water route, reduce rates between competitive points, it shall not be permitted to increase them unless, after hearing by the Commission, it shall be found that the proposed increase rests upon changed conditions other than elimination of water competition, has no application where the reduction was with the approval of the Commission, ordered after hearing, upon application by the carrier for relief from the long and short haul clause.  P. 564.

*Held,* that, in this case, changed conditions "other than the elimination of water competition," were found by the Commission.  P. 569.

An order under § 4 of the act, granting relief from the long and short haul clause, is subject to future modification by the Commission without any application from the carrier.  P. 570.

Affirmed.

THE case is stated in the opinion.

*Mr. Joseph N. Teal,* with whom *Mr. William C. Mc-Culloch, Mr. L. B. Stedman* and *Mr. W. E. Creed* were on the brief, for appellant.

*Mr. Assistant Attorney General Frierson* for the United States.

*Mr. Albert L. Hopkins,* with whom *Mr. P. J. Farrell* was on the brief, for the Interstate Commerce Commission.

*Mr. John F. Finerty,* with whom *Mr. E. C. Lindley, Mr. M. L. Countryman, Mr. Charles Donnelly, Mr. O. W. Dynes* and *Mr. A. C. Spencer* were on the brief, for the appellee railroad companies.

MR. JUSTICE BRANDEIS delivered the opinion of the court.

The last paragraph of § 4 of the Act to Regulate Commerce, as amended by Act of June 18, 1910, c. 309, § 8, 36 Stat. 539, 547, declares that: "Whenever a carrier by railroad shall in competition with a water route or routes reduce the rates on the carriage of any species of freight to or from competitive points, it shall not be permitted to increase such rates unless after hearing by the Interstate Commerce Commission it shall be found that such proposed increase rests upon changed conditions other than the elimination of water competition."

On August 21, 1916, Skinner & Eddy Corporation brought this suit in the District Court of the United States for the District of Oregon to enjoin an increase in carload rates on iron and steel products from Pittsburgh to Seattle. The United States, the Commission, and sixteen railroads were joined as defendants. The bill charged that the action of the carriers in increasing

their rates and that of the Commission in authorizing
such increase violated the above provision of the Com-
merce Act and, being beyond their respective powers,
was void.  The relief asked against the carriers was to
prevent the collection of the proposed increased rates
until the "Commission shall have held a hearing to de-
termine whether the proposed increases rest upon changed
conditions other than the elimination of water competi-
tion."  The relief asked against the Commission was to
prevent its taking any steps to enforce certain orders
"so far as the same permit" such increases.  An appli-
cation for an interlocutory injunction heard before three
judges on December 29, 1916, was denied; and later the
bill and a supplemental bill, filed December 16, 1916,
were dismissed on the ground that they do not state
any cause of action.  The case comes here by direct
appeal.  The essential facts are these:

After the decision by this court in *Intermountain Rate
Cases*, 234 U. S. 476, and while the *Sacramento Case
(United States v. Merchants & Manufacturers Traffic
Association*, 242 U. S. 178) was pending in the District
Court, carriers forming connecting lines between Pitts-
burgh and Seattle applied to the Commission in the
same proceeding for further modification of Amended
Fourth Section Order No. 124, so as to permit a reduction
in carload rates on iron and steel products from Pitts-
burgh to Seattle without making such reduced rates
applicable to intermediate points of destination.  An
order granting leave for a reduction from 80 cents [1] to
65 cents per 100 pounds was entered March 1, 1916.
*Rates on Iron and Steel Articles*, 38 I. C. C. 237.  The
carriers soon thereafter filed tariffs making that reduction

---

[1] 80 cents was the specific published rate; but the combination of
the Pittsburgh-Chicago rate of 18.9 cents and the Chicago-Seattle
rate of 55 cents was 73.9 cents, and it was at this rate that the traffic
from Pittsburgh actually moved.

effective April 10, 1916; and on that date, the 65-cent rate became operative.

During March, 1916, two applications had been made to the Commission in the same proceeding on behalf of shippers to reopen for further consideration other fourth section applications of carriers concerning westbound transcontinental rates and for modification of orders issued thereon. The petitioners for such modification were the Spokane Merchants' Association and the Railroad Commission of Nevada, which had theretofore taken an active part in the proceedings (*Railroad Commission of Nevada* v. *Southern Pacific Co.*, 21 I. C. C. 329; *Commodity Rates to Pacific Coast Terminals*, 32 I. C. C. 611). Their prayer was for removal of the existing discrimination in transcontinental freight rates against the intermountain territory and in favor of the Pacific Coast ports. The ground alleged for seeking the modification was that by reason of slides in the Panama Canal and the increased demand for shipping due to the World War, water competition, which had theretofore been held to justify lower rates to the Pacific Coast ports, had in large part disappeared. Thereupon the Commission reopened on April 1, 1916, these applications, including that on which was entered the order of March 1, 1916, respecting iron and steel rates from Pittsburgh to Seattle; and a hearing was ordered "respecting the changed conditions which are alleged in justification of a modification of the Commission's orders."

None of the railroads had requested the reopening of the applications or the hearing; and when it was held, all opposed further modification of the transcontinental rates. No increased rates were proposed by them; and no specific increased rates were considered by the Commission. The petitioners introduced evidence respecting the changed conditions as a basis for modifying the several fourth section orders. On June 5, 1916, the Com-

mission filed a report (*Reopening Fourth Section Applications*, 40 I. C. C. 35) in which it found that while the Panama Canal had been meanwhile reopened there was not then "any effective water competition between the two coasts" or likely to be any in the near future, and that "the war and an unparalleled rise in prices for ocean transportation have so changed the situation as to transform a relation of rates which was justified when established to one that is now unjustly discriminatory against intermediate points." It found also that these conditions were temporary. An order (amended July 13, 1916) was then entered, effective September 1, 1916, rescinding those previously entered on the several applications of carriers, including that of March 1, 1916, authorizing the 65-cent Pittsburgh-Seattle rate; and the carriers were directed to reduce the degree of discrimination then existing in favor of Pacific Coast ports as against intermediate territory.

Upon entry of this order the carriers filed tariffs effective September 1, 1916, raising, among others, the Pittsburgh-Seattle iron and steel rates from 65 cents to 94 cents. Promptly, on August 4, 1916, Skinner & Eddy Corporation protested, requested that the tariffs be suspended until a hearing could be had thereon, and alleged that the proposed increase violated, as later set forth in its bill of complaint, the last paragraph of the fourth section. Their request was not then granted. Thereafter, by action of the Commission and the carriers, not necessary to detail, the effective date of the tariff fixing the 94-cent rate was postponed to December 30, 1916; and meanwhile these tariffs were, with consent of the Commission, canceled upon the understanding that new tariffs fixing a 75-cent rate effective on that day would be filed. When the 75-cent rate was filed, Skinner & Eddy Corporation again protested on the same ground and made, as theretofore, the same request for a sus-

pension of the tariffs and a hearing; and again the request
was not granted.

*First.* The defendants contend that the District Court
did not have jurisdiction of the subject-matter of this
suit; because orders entered in a fourth section proceeding
cannot be assailed in the courts; at least, not until after
a remedy has been sought under §§ 13 and 15 of the Act
to Regulate Commerce. This contention proceeds ap-
parently upon a misapprehension of plaintiff's position.
If plaintiff had sought relief against a rate or practice
alleged to be unjust because unreasonably high or dis-
criminatory, the remedy must have been sought pri-
marily by proceedings before the Commission, *Loomis* v.
*Lehigh Valley R. R. Co.,* 240 U. S. 43, 50; *Texas & Pacific,
Ry. Co.* v. *American Tie & Timber Co.,* 234 U. S. 138, 146;
*The Minnesota Rate Cases,* 230 U. S. 352, 419; *Robinson*
v. *Baltimore & Ohio R. R. Co.,* 222 U. S. 506; *Baltimore
& Ohio R. R. Co.* v. *Pitcairn Coal Co.,* 215 U. S. 481; and
the finding thereon would have been conclusive, unless
there was lack of substantial evidence, some irregularity in
the proceedings, or some error in the application of rules
of law, *Manufacturers Ry. Co.* v. *United States,* 246 U. S.
457, 482; *Pennsylvania Co.* v. *United States,* 236 U. S. 351,
361; *Los Angeles Switching Case,* 234 U. S. 294, 311; *Kansas
City Southern Ry. Co.* v. *United States,* 231 U. S. 423, 440;
*Procter & Gamble Co.* v. *United States,* 225 U. S. 282, 297–
298; *Interstate Commerce Commission* v. *Union Pacific
R. R. Co.,* 222 U. S. 541. But plaintiff does not contend
that 75 cents is an unreasonably high rate or that it is
discriminatory or that there was mere error in the action
of the Commission. The contention is that the Com-
mission has exceeded its statutory powers; and that, hence,
the order is void. In such a case the courts have juris-
diction of suits to enjoin the enforcement of an order,
even if the plaintiff has not attempted to secure redress
in a proceeding before the Commission. *Interstate Com-*

*merce Commission* v. *Diffenbaugh,* 222 U. S. 42, 49; *Louisiana & Pacific Ry. Co.* v. *United States,* 209 Fed. Rep. 244, 251; *Atlantic Coast Line R. R. Co.* v. *Interstate Commerce Commission,* 194 Fed. Rep. 449, 451. *The Sacramento Case, supra,* was a case of this character. Compare *Interstate Commerce Commission* v. *Louisville & Nashville R. R. Co.,* 227 U. S. 88, 92; *Southern Pacific Co.* v. *Interstate Commerce Commission,* 219 U. S. 433. The District Court properly assumed jurisdiction of this suit.

*Second.* The defendants contend, also, that if the subject-matter was within the jurisdiction of a District Court of the United States, it was not within that of Oregon. The objection is based upon the Act of October 22, 1913, c. 32, 38 Stat. 208, 219, which declares: "The venue of any suit hereafter brought to enforce, suspend, or set aside, in whole or in part, any order of the Interstate Commerce Commission shall be in the judicial district wherein is the residence of the party or any of the parties upon whose petition the order was made." And it is asserted that the parties upon whose petition the order was made, are the Merchants' Association of Spokane, a resident of the Eastern District of Washington, and the Railroad Commission of Nevada, a resident of the District of Nevada. The applications of these parties, filed in March, 1916, were doubtless instrumental in securing a reopening of the proceedings which resulted in the order complained of. But the proceedings in which the order was made were the original applications of carriers for relief under the fourth section. The report and the order are entitled, "In the Matter of Reopening Fourth Section Applications." One of the carriers which had made such application—for relief from the provisions of the fourth section was a resident of Oregon, namely, the Oregon-Washington Railroad and Navigation Company; and as it was joined as defendant in the suit, the District Court for Oregon had jurisdiction over the parties.

*Third.* The main contention of plaintiff is that, as the carriers had in 1916 reduced the rate from 80 cents to 65 cents, neither the carriers nor the Commission had power to increase the rate without a prior finding by the Commission upon proper hearing "that such proposed increase rests upon changed conditions other than the elimination of water competition;" and that no such hearing had been had or finding made.

In construing this provision it is important to bear in mind the limits of the Commission's control over rates. Neither the Act to Regulate Commerce nor any amendment thereof has taken from the carriers the power which they originally possessed, to initiate rates; that is, the power, in the first instance, to fix rates or to increase or to reduce them.[1] Legislation of Congress confers now upon the Commission ample powers to prevent by direct action the exaction of excessively high rates. The original act, proceeding upon the common-law rule which prohibits public carriers from charging more than reasonable rates, gave the Commission power to declare illegal one unduly high; but even after such a determination the Commission lacked the power to fix the rate which should be charged. *Cincinnati, New Orleans & Texas Pacific Ry. Co.* v. *Interstate Commerce Commission*, 162 U. S. 184, 196–197; *Interstate Commerce Commission* v. *Cincinnati, New Orleans & Texas Pacific Ry. Co.*, 167 U. S. 479; *Interstate Commerce Commission* v. *Alabama Midland Ry. Co.*, 168 U. S. 144, 161. Effective control was not secured until the Act of 1906 had given to the Commission the

[1] By Act of August 9, 1917, c. 50, § 4, 40 Stat. 270, 272, it was provided that until January 1, 1920, no increased rate or fare shall be filed except after approval thereof has been secured from the Commission. On the 28th day of December, 1917, the Government took control of the railroads, as a war measure, under Act of August 29, 1916, c. 418, 39 Stat. 619, 645. Proclamation of December 26, 1917, 40 Stat. 1733, 1734.

power to fix, after such hearing, the rate which should be charged; *Interstate Commerce Commission v. Humboldt S. S. Co.*, 224 U. S. 474, 483; and the Act of 1910 had given it power to suspend, during investigation, tariffs for new rates, and placed upon the carrier the burden of proof to establish the reasonableness of the increased rates. *M. C. Kiser Co. v. Central of Georgia Ry. Co.*, 236 Fed. Rep. 573.

Congress, however, steadfastly withheld from the Commission power to prevent by direct action the charging of unreasonably low rates. The common law did not recognize that the rate of a common carrier might be so low as to constitute a wrong; and Congress has declined to declare such a rule. Despite the original Act to Regulate Commerce and all amendments, railroads still have power to fix rates as low as they choose and to reduce rates when they choose.[1] The Commission's power over them in this respect extends no further than to discourage the making of unduly low rates by applying deterrents. One such deterrent is found in the fact that low rates, because voluntarily established by the carrier, may be accepted by the Commission as evidence that other rates, actual or proposed, for comparable service are unreasonably high. *Board of Trade of Carrollton, Ga., v. Central of Georgia Ry. Co.*, 28 I. C. C. 154, 164; *Sheridan Chamber of Commerce v. Chicago, Burlington & Quincy R. R. Co.*, 26 I. C. C. 638, 647. Compare *Louisville & Nashville R. R. Co. v. United States*, 238 U. S. 1, 11 *et seq.* The voluntary making of unremuneratively low rates in important traffic may also tend to induce the Commission to resist appeals of carriers for general rate increases on the ground of financial necessities. But the main source of the Commission's influence to prevent excessively low

---

[1] Subject only to the requirement of notice as provided in § 6 of the Act to Regulate Commerce, as amended.

rates lies in its power to prevent unjust discrimination. ᐧ
Compare *Houston, East & West Texas Ry. Co.* v. *United* .
*States,* 234 U. S. 342. The order prohibiting the unjust ᐧ
discrimination, however, leaves the carrier free to con-
tinue the lower rate; the compulsion being that if the low
rate is retained, the rate applicable to the locality or
article discriminated against must be reduced. ᐧThat is,
the carrier may remove the discrimination either by rais-
ing the lower rate to the relative level of the higher, or
by lowering the higher to the relative level of the lower,
or by equalizing conditions through fixing rates at some .
intermediate point. *American Express Co.* v. *Caldwell,*
244 U. S. 617, 624.

. A special group of cases in which the Commission may
indirectly prevent unduly low rates through its power·to ᐧ
prevent unjust discrimination is that provided for by the
long and short haul clause. It was enacted to remedy
one large class of discriminations by creating a legislative
presumption that the charge of more for a short haul .
under substantially similar circumstances and conditions
.than for a longer distance over the same line in the same
direction was unjust. As originally enacted, the provision
was construed to authorize the carrier to determine pri-
marily whether the required dissimilarity of circumstances ᐧ
and conditions existed and also to authorize the acceptance
of competitive conditions as a justification of a lower rate
for the .longer distance. So construed, the provisions
proved inefficacious, and the act was amended in 1910 by
striking out the "substantially similar circumstances and
conditions" clause and making the prohibition absolute
except to "the extent to which such designated common
carrier may be relieved from the operation of this section"
.by the Commission. *Intermountain Rate Cases, supra.*
But the lack of power to prevent by direct action exces-
sively low rates remains; the carrier still having the option,
if relief from the operation of the fourth section is denied,

to keep in effect the low rate to the more distant point by lowering the rates to intermediate points.

The last paragraph of § 4, here in question, which was added by the Act of 1910, was designed to prevent the railroads from killing water competition by making excessively low rates. But again Congress refrained from prohibiting the carrier to reduce the rate and declined to confer upon the Commission power to prevent by direct action a reduction. The act still leaves the carrier absolutely free to make as low a rate as it chooses; and merely provides another deterrent, in declaring that, if the rate is once reduced in competition with a water route or routes, it cannot, thereafter, be increased, "unless after hearing by the Interstate Commerce Commission it shall be found that such proposed increase rests upon changed conditions other than the elimination of water competition." This provision may become operative in any case where there has been competition between a railroad and a water line, inland or coastwise. But we have now to determine merely whether the prohibition applies where the rates in question were reduced with the approval of the Commission given after hearing, by order entered upon application of the carrier for relief from the operation of the fourth section.

The language of the paragraph is general and read alone might compel that construction. But it may not be read alone. It must be construed in the light of the purpose of its enactment, of the earlier paragraphs of § 4, and of other sections in the Act to Regulate Commerce designed to prevent unjust discrimination. The specific purpose of § 4 was to prevent discrimination by charging less for the longer haul, unless in the opinion of the Commission the circumstances make such action just. Discrimination, just when sanctioned, may become most unjust. Recognizing this fact, Congress provided that the judgment of the Commission should be exercised

"from time to time" to determine "the extent to which
[the] . . . carrier may be relieved from the operation
of this section." In other words, the leave granted is not
for all time. It is revocable at any time, either because
it was improvidently granted or because new conditions
have arisen which make its continuance inequitable.
The specific purpose of the last paragraph of § 4 is to
ensure and preserve water competition; to prevent com-
petition that kills. A reduction made under the authority
of a fourth section order after full hearing must have
been found by the Commission to have been reasonably
necessary in order to preserve competition between the
rail and the water carrier. A reduction so made is not
within the reason of the prohibition declared by the last
paragraph. Transportation conditions are not static;
the oppressor of today may tomorrow be the oppressed.
And in order to preserve competition between rail and
water carriers it is necessary that the Commission's
power to approve a modification of rates be as broad as
it is to approve a modification in order to prevent unjust
discrimination. Even a literal reading of § 4 would not re-
quire that the prohibition contained in the last paragraph
be extended to reductions made with the approval of
the Commission. The preceding paragraph declares
that "the commission may from time to time prescribe
the extent to which such designated common carrier
may be relieved from the operation of this section." The
last paragraph is a part of the section. Why should not
the Commission's power to relieve be extended to it?

The construction contended for by plaintiff would
rather ensure monopoly than preserve competition. If
a rail rate reduced in competition with a water route for
the avowed purpose of preserving competition by rail
should result, contrary to the Commission's expectations,
in eliminating the water competition, because so low as
to drive the water carrier out of business, then the pro-

hibitively low rate would have to be continued permanently and other water competition be thereby prevented from arising; unless, perchance, some changed condition should develop which might make removal of the bar possible. Or, if the reduction in the rail rate, sanctioned by the Commission under the fourth section as not unjustly discriminating against intermediate points, because forced upon the rail carriers by oppressive water competition designed to destroy its business to the port, should become thereafter unjustly discriminatory, because the water carrier, destroyed by its own rate cutting, abandoned the route, still the low rail rate and resulting discrimination would have to continue. Only compelling language could cause us to impute to Congress the intention to produce results so absurd; and the language of the last paragraph of § 4 is clearly susceptible of the more reasonable construction contended for by defendants.

*Fourth.* The defendants further contend that, even if the prohibition of the last paragraph of § 4 be construed to apply also where the reduction was made with the authority of the Commission, the increase of the Pittsburgh-Seattle rate to 75 cents is valid, because the finding of the Commission complies with the prescribed condition that the increased rate must rest "upon changed conditions other than the elimination of water competition." It found in terms that: "the conditions formerly existing have materially changed"; that "the withdrawal of boats from this [coast to coast] service has not been on account of the rates made by the rail carriers with which the boats compete, but on account of slides in the Panama Canal and the extraordinary rise in ocean freights"; that the substantial disappearance of water competition was merely temporary; that competing water carriers "announced their intention ultimately to return to this service" and "that the time of such return depended in

part upon the measure of the rates they would be able to secure for this service in competition with the rail lines." It is clear that the changed conditions so found are something other than the "elimination of water competition" which Congress intended should not justify raising the reduced rates. Compare *American Insulated Wire & Cable Co.* v. *Chicago & North Western Ry. Co.*, 26 I. C. C. 415, 416.

*Fifth.* The plaintiff attacks, however, the validity of the order of June 5, 1916 (amended July 13, 1916) also on the ground that it was not made upon application of the carrier—insisting that application by the carrier is not only a prerequisite to the original granting of relief under the fourth section, but also to the modification from time to time by the Commission of the relief afforded. This court expressed in the *Sacramento Case, supra,* at p. 187, its doubt whether such application was a prerequisite even to the original granting of relief. It is clear that application by the carrier is not a prerequisite to modification. As shown above, orders granting relief under the fourth section are not grants in perpetuity. Neither a carrier nor a favored community acquires thereby vested rights. Necessarily implied in each such order is the term, "until otherwise ordered by the Commission"; and the original application is always subject to be reopened, as it was here.

The District Court did not err in dismissing the bill (and supplemental bill) on the merits; and its decree is

*Affirmed.*