### NEW RIVER CO. et al. v. CHESAPEAKE & O. RY. CO. et al.

(District Court, S. D. West Virginia. August 10, 1923.)

No. 1276.

1. **Commerce ⬤═92—Order of Interstate Commerce Commission held reviewable.**

An order of the Interstate Commerce Commission, reversing a former decision relating to distribution of cars to coal mines, and reinstating a former rule of distribution; *held* in effect an affirmative order, and subject to review by a District Court.

2. **Commerce ⬤═85—Constitutional law ⬤═278(1)—Interstate Commerce Commission cannot by regulation deprive owner of coal mine of "property" right in location.**

The owner of a coal mine having access to two carriers has a property right in the advantage of such location, of which he cannot lawfully be deprived by an order of the Interstate Commerce Commission under the guise of a regulation, which in effect deprives him of his property without due process of law.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Property.]

3. **Carriers ⬤═32(2)—Order of Interstate Commerce Commission relating to distribution of coal cars held invalid, as discriminatory.**

An order of the Interstate Commerce Commission, establishing a rule under which in times of shortage of coal cars a "joint" mine, situated on the lines of two railroads, could order cars from both only on the basis of 100 per cent. of its rated capacity, while a "local" mine, situated on one only of such lines and having a like capacity, could order an equal

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

number of cars, *held* discriminatory, in that it deprived the first mine of an advantage to which it had a legal right.

Woods, Circuit Judge, dissenting.

In Equity. Suit by the New River Company and others against the Chesapeake & Ohio Railway Company, the Virginian Railway Company, the United States, and the Interstate Commerce Commission. On application by complainant for preliminary injunction, and motions by defendants to dismiss bill. Motions to dismiss denied, and motion for injunction granted.

James W. Carmalt, of Washington, D. C., A. C. Burnham, of Boston, Mass., and C. W. Dillon, of Fayetteville, W. Va., for plaintiff.

P. J. Farrell, of Washington, D. C., for Interstate Commerce Commission.

Blackburn Esterline, of Washington, D. C., for the United States.

George T. Bell, of Washington, D. C., for intervening defendants Slab Fork Coal Co. and others.

Before WOODS and WADDILL, Circuit Judges, and McCLINTIC, District Judge.

McCLINTIC, District Judge. This is a suit in equity, brought under the provisions of the Urgent Deficiency Appropriation Act, approved October 22, 1913, found in 38 Stat. 219. This case arises under that part of the act which abolished the Commerce Court, and gave jurisdiction, under certain circumstances, to the District Courts. When an application is made for an injunction, temporary or permanent, under this act, and the District Judge decides that it is a proper case to hear, it becomes his duty to call to his assistance, to hear and determine the application, two other judges, one of whom must be a Circuit Judge.

The bill in this cause was presented to the District Judge of the Southern District of West Virginia, on the 29th day of January, 1923, and an order was made, filing the bill of complaint, and setting for hearing the application for the temporary restraining order and interlocutory injunction therein prayed for, at the courtroom of the United States District Court, at Richmond, Va., on Tuesday, February 6, 1923, and it was further ordered that a copy of the bill be served upon each defendant in said cause.

This case came on for hearing before Hon. CHARLES A. WOODS and Hon. EDMUND WADDILL, Jr., Circuit Judges, and Hon. GEORGE W. McCLINTIC, District Judge, at Richmond, on the said 6th day of February, 1923. The defendant the United States of America and the defendant the Interstate Commerce Commission appeared by counsel, and moved the court to dismiss the bill for want of jurisdiction and want of equity, for reasons set out in separate written motions, duly filed. The defendants the Chesapeake & Ohio Railway Company and the Virginian Railway Company each appeared by counsel, and filed answers to the bill in this cause. The Slab Fork Coal Company, and numerous other companies, as intervening defendants, appeared and by leave of court filed their intervening petition and mo-

tion to dismiss, and later filed their answer to the bill of complaint herein.

This cause came on to be heard on the said 6th day of February, 1923, upon the bill and exhibits, upon the motions above set out, and the answers filed, and upon the evidence taken in open court, and a temporary restraining order was entered on the 8th day of February, 1923, staying and suspending the operation of a certain decision, ruling, and order of the Interstate Commerce Commission, made on the 11th day of December, 1922, and of rule 4 of Circular C. S. 31 (revised), for the period of 60 days from said date, pending the application for an injunction. Later the bill was amended by leave of court, and the answers of the intervening defendants were also amended by leave of court. On the 30th day of March, 1923, this cause came on for final hearing before the same judges, and was submitted for decision, and an order was entered continuing the temporary stay and suspension until the final decision upon the application.

The bill in this cause was filed by the New River Company and six subsidiary companies, named as plaintiffs. All the stock of the six subsidiary companies is owned by the New River Company, and such companies operate mines situated in Fayette and Raleigh counties of West Virginia, and in the Southern district thereof. Under the designation of the Interstate Commerce Commission, mines in this region are divided into two classes, to wit, "joint mines" and "local mines." By the designation "joint mines" is meant those mines situated on, and entitled to service from, two or more carriers. By the designation "local mines" there is meant those on, or accessible to, one carrier. In this opinion, they will be so designated for the purpose of convenience.

In this region there are many mines other than those of the plaintiffs, which are joint mines, and there are many mines which are local mines. The intervening petitioners all own local mines. The railway companies in this particular case, which serve these mines, are the Chesapeake & Ohio Railway and the Virginian Railway.

The question which comes up for decision in this case is whether a joint mine shall be allowed to order such cars as it may need, according to its rated capacity as fixed under the rule, from each railroad, or shall it be allowed only to order such number of cars from both carriers as it would be allowed to order from one carrier? The history of this question appears from the record in this case to be as follows:

For a period of years prior to the taking of federal control of railroads, cars were distributed in time of car shortage to joint mines in the New River fields, by each of the carriers, by what will, for convenience, be referred to as the New River rule; that is, there was no distinction between joint mines and local mines, and cars were distributed to joint mines, according to their proportionate share of the available car supply in that region, as determined by the rated capacity of the shipper, and without reference to, or inquiry into, the car supply furnished by any other railway. The only limitation placed on the mine

was that these orders for cars, based on its rating, should not result in a car supply greater than the capacity of the mines to ship. If, in practice, the orders were so placed as to exceed the capacity of the mine to ship, the penalty rule was provided, in order to limit the car supply for its succeeding days, and ultimately to be reflected in the rated capacity of the mine for the succeeding months. This rule here described, has sometimes been called "the 200 per cent. rule."

By the decision of the Interstate Commerce Commission in the Illinois case (In re Irregularities in Mine Ratings, 25 Interst. Com. Com'n R. 286), the Commission required that the carrier shall furnish daily to the operators a statement of the available car supply for the following day. Under the car service rules appended to the bill in this record, the mines place their orders at 4 p. m. on each day for the following day. Where there are two carriers, this rule, known as the Illinois rule, permits the joint mine to order from each carrier such number of cars as it may need, based on its rated capacity, not to exceed 75 per cent. of such rated capacity. This is sometimes called the "150 per cent. rule."

When under the law the government took charge of the railroads, the Director General of Railroads provided for the distribution of cars for mines in accordance with Circular C. S. 31, rule 4, hereinafter referred to as rule 4. In effect, this rule was, and is, that a joint mine could only order from the carriers 100 per cent. of its rated capacity, and stood in no better position than a local mine; indeed, it was not in so good a position as a local mine, unless it ordered all of its cars from the carrier having the greatest supply of cars on that particular day.

This rule 4 continued to be the measure of car distribution so long as federal control of railroads continued, and thereafter, until the decision of the Interstate Commerce Commission on the 21st day of June, 1921, in the case of Fairmont & Cleveland Coal Co. v. Baltimore & Ohio Railroad Co., 62 Interst. Com. Com'n R. 269. It was decided by the Commission that rule 4 of Circular C. S. 31 (revised) was unreasonable and unduly prejudicial to joint mines, and unduly preferential to local mines, to the extent that it limited the aggregate orders of the joint mine commission to 100 per cent. of its rated capacity from both roads, and that for the future, during periods of car shortage, the carrier should distribute cars to the joint mines on their lines, considered in that case, on the basis outlined in the Illinois rule, namely, on days when the joint mine orders cars from only one carrier, and on days on which it orders cars from both carriers, its rating on each of such carriers shall be 75 per cent. of its full rating, subject to the limitation that it shall on no day be supplied with cars in excess of its maximum rating; and that informaton should be exchanged between carriers, showing the left-over cars, in order to prevent any abuses that might come therefrom.

This rule then continued in force until a decision was entered by the Interstate Commerce Commission on the 11th day of December, 1922, in the case of Bell & Zoller Coal Company, et al. v. Baltimore & Ohio

Southwestern Railroad Company et al., wherein an order was entered and an opinion filed, reversing the opinion in the Fairmont Case, supra, and again putting into effect rule 4 of Circular C. S. 31 (revised).

Following this decision, the carriers, the Chesapeake & Ohio Railway Company and the Virginian Railway Company, arranged to put into effect said rule 4, the one on the 1st day of February, 1923, and the other on the 10th day of February, 1923. This suit was instituted to enjoin such acts on the part of the carriers, and action was taken therein as above set forth, relative to the temporary restraining order.

[1] The question is raised whether this court has any jurisdiction. It is claimed that it has none, on the ground that the decision of the Interstate Commerce Commission is. negative, and no appeal can be taken therefrom, under the ruling of the Supreme Court in the case of Proctor & Gamble Co. v. United States, 225 U. S. 286, 32 Sup. Ct. 761, 56 L. Ed. 1091. This question is raised by the motions to dismiss, filed by the United States and Interstate Commerce Commission, and by intervening defendants.

Without going into a full discussion thereof, we are of opinion that the decision of the Interstate Commerce Commission was in substance and effect affirmative, and that the carriers so understood it, and acted upon it, as an affirmative order, and in consequence thereof, took affirmative action, and the results, so far as the rights claimed by the plaintiffs were concerned, was the same as if the order had been affirmative in form. It is a case in which we must deal with the substance and not the form. We are therefore of opinion that the Proctor & Gamble case, and other cases of like nature, do not apply here, and that this court has jurisdiction to pass upon the questions raised by the pleadings.

[2] The facts developed by the evidence show very large expenditures made by the plaintiffs, for the purpose of shipping coal by the two carriers. It is also shown that the shortage of cars on each carrier continues most of the time, and that the right to ship coal by each carrier, is a valuable property right. If the right to ship by each carrier, and to receive cars from each carrier, on the basis of rated capacity, is denied to the plaintiffs, and to other shippers in like condition, the financial loss will be very great, and the value of their properties will be greatly depreciated. Much larger prices have been paid for mines which had access to the lines of two carriers than would be thought of for similar mines with access only to the line of one carrier. When there is any real market for coal, car shortage has always existed, and, so far as can be foreseen, will always exist. This case would not have arisen, if each carrier had always on hand a sufficient supply of cars, to take care of the demands of each shipper.

The shipper of any commodity who has access to more than one carrier has a right to choose one carrier, or to divide his goods among two or more carriers, with the advantages naturally belonging to such location, giving such access, and while the Interstate Commerce Commission has, under the law, certain powers of regulation, yet it is beyond such powers to deprive the shipper of such right, under the guise

of regulation, or to limit such right in such way as to amount to the deprivation thereof. From the adjudged cases, it is plainly to be seen that the Interstate Commerce Commission has no authority to exercise its powers so arbitrarily as virtually to transcend such authority conferred, although it may be not technically doing so. Proctor & Gamble Co. v. United States, supra.

A so-called regulation, which destroys at least 30 per cent. of the market value of a coal property, certainly transcends such authority. It is a taking of private property without due process of law, by depriving the owner of the power to use it in a legitimate and proper way, for the commercial purpose for which it was designed and developed, by the large extra expenditures of money as shown by the evidence in this cause. Of course, a commercial advantage will accrue to the joint mine, over the local mine, by the abrogation of rule 4, but in our opinion that advantage constitutionally belongs to it, by reason of its location, and one that the Interstate Commerce Commission cannot order the carriers to take away from it, and one of which the carrier cannot legally deprive it.

A question analogous to this was before a three-judge court in Pennsylvania recently, in the case of Pennsylvania Railroad Co. v. United States, and the court therein decided that the order of the Interstate Commerce Commission was erroneous, and the same was enjoined and suspended. Davis, Circuit Judge, in the opinion of the court, in deciding that the industries situated in a certain zone, where they had access to two carriers, were entitled to such advantage over those out of the zone, and on the line of one carrier, said:

"It has been repeatedly held that, where one company serves a community or industry located on the tracks of another under a trackage arrangement, the situation in effect is the same as if the former company had extended its own tracks to such community or industry. Commercial Club of Superior, Wis., v. Great Northern Railway, 24 I. C. C. 96; Penick & Ford v. Director General, 61 I. C. C. 173; Louisville & Nashville Railroad v. United States et al., 242 U. S. 60. The industries, therefore, located along the tracks of either company in the zone, are in law to be considered as on the individual tracks of both companies, and the industries beyond this zone as located on the tracks of one of the companies only. Consequently, in legal effect, these industries which are within the zone and those without the zone are not similarly situated, but are in a substantially different position. And so the advantage enjoyed by the industries within the zone over those without the zone is not, within the meaning of the act, an undue or unreasonable preference. Ridge Coal Mining Co. v. Missouri Pacific R. R. Co., 62 I. C. C. 259; Dering Mines Co. et al. v. Director General, 62 I. C. C. 265; Louisville & Nashville Railroad Company et al. v. United States et al., supra. 'A carrier must use its existing facilities impartially,' and the railroads, under the facts in this case, are under no obligation to extend or curtail their facilities. The legal position of the industries in the zone is just the same as though they were located at some other part of the city away from the tracks. An industry selecting a disadvantageous location for reasons justifiable to itself has no right to call upon the carriers to overcome such disadvantage at their expense, and this is what the industries outside of the zone, so far as the legal situation is concerned, did."

[3] We mean only to hold that Circular C. S. 31, rule 4 (revised), and the action of the carriers in putting it in force, is erroneous, and must be enjoined and suspended.

The order will be entered, without prejudice to the Interstate Commerce Commission making proper orders relative to reasonable car distribution, to joint as well as local mines, not in conflict with the views hereinbefore expressed.

WOODS, Circuit Judge (dissenting). The rule for distribution of cars to coal mines, other than anthracite mines, in time of shortage, established while the railroads were under government control, was as follows:

"Copies of orders for cars for a mine that is joint with any other carrier (steam, electric or water) shall be filed with the designated representative of each such carrier, such combinations of orders must not exceed the gross daily rating of the mine."

Joint mines are those served by two or more carriers. Local mines are those served by only one carrier. The rule meant that in car distribution joint mines were to be rated on the same basis as local mines: that is, they were to have no advantage by reason of the double service. After release of the railroads from federal control, the Interstate Commerce Commission recommended that carriers continue the rule in force "until such time as the experience of the carriers or the Commission should dictate other and more appropriate rules for the rating and distribution of cars to coal mine."

On January 11, 1921, the complainants in this case filed complaints before the Interstate Commerce Commission against the Chesapeake & Ohio Railway Company and the Virginia Railway Company, alleging the rule hereinbefore quoted, now known as rule 4 of Circular C. S. 31, to be unduly preferential to complainant's competitors, the local mines. These cases before the Interstate Commerce Commission, known as Nos. 12083 and 12084, were consolidated with Nos. 12081 and 12082, similar in character. After hearing, the Commission found rule 4 to be unjustly and unreasonably favorable to local mines, and further found that the joint mines should have a rating in car distribution in the proportion of 150 per cent. for the joint mines to 100 per cent. for the local mines; that is, the joint mines might have 75 per cent. on each carrier as against 100 per cent. to the local mines on one carrier. At the conclusion of the opinion the Commission said:

"We have not required that car service rules be filed as tariff schedules. We will not in this proceeding direct that the rules which we herein find to be reasonable be so filed. We shall expect, however, that defendants will promptly amend their car service rules, so as to conform with our finding and evidence same by filing copies thereof with us."

No order was made by the Commission. Similar complaints, by coal operators in Indiana and Illinois, had been filed before the Commission, known as Bell & Zoller Coal Company et al. v. Baltimore & Ohio Southwestern Railroad Company et al., Nos. 12362 and 12399. While these last complaints were pending, a petition was filed before the Interstate Commerce Commission by the owners of local mines concerned to reopen the former holding of the Commission in Nos. 12083 and 12084, that the 150 per cent. rule in favor of joint mines was just

and reasonable. The cases were consolidated. After full hearing of evidence and argument, the Commission reversed its former conclusions and found that rule 4—the equality rule, without regard to whether a mine was served by one road or more—was just and reasonable. The complaints of the owners of all the joint mines, including those of the complainants in this suit, were dismissed by the following order:

"These cases being at issue upon complaints, answers, and intervening petitions on file, and having been duly heard and submitted by the parties, and full investigation of the matters and things involved having been had, and the Commission having, on the date hereof, made and filed a report containing its findings of fact and conclusions thereon, which said report is hereby referred to and made a part hereof: It is ordered, that the complaints in these proceedings be and they are hereby dismissed."

There was never any order, or even final determination, of the Commission to put into effect any rule or to interfere with rule 4 of the railroads. The conclusions announced in its opinion were reopened, reconsidered, and changed; but all this was done in one consolidated proceeding, which was never ended until the Commission made the order above quoted. This last order was a final dismissal of the complaints, and a refusal to take any action with respect to rule 4 of the railroads. It was, therefore, a negative order—a mere refusal to interfere with an existing rule. As such it was not reviewable by this court. Proctor & Gamble v. United States, 225 U. S. 282, 32 Sup. Ct. 761, 56 L. Ed. 1091. The action of the Interstate Commerce Commission in the case cited had more the semblance of affirmative action than in this, for there Proctor & Gamble asked the revocation or modification of a rule expressly approved by the Commission, while here, in a continuous proceeding, the Commission merely reached the ultimate conclusion that it would not interfere with an existing rule of the railroads. I therefore think the court had no jurisdiction whatever to enjoin the railroads from operating under rule 4 as a rule established by affirmative action of the Interstate Commerce Commission.

Even, however, if rule 4 had been adopted and put into effect by the Interstate Commerce Commission, it seems to me perfectly clear that this court has not power to change it. It is apparent from the above statement that the Interstate Commerce Commission has devoted much time and care to the consideration of the justness and reasonableness of the rule. To say the least, it cannot be doubted that the whole matter is debatable, and that there are very strong reasons in favor of rule 4, as distinguished from the 150 per cent. rule claimed by the complainants. Even if this Court entertains the opinion that the action of the Commission was unwise and improper, that affords no ground to say that a prima facie case for an injunction has been made out. Interstate Commerce Commission v. Illinois Cent. R. R., 215 U. S. 452, 478, 30 Sup. Ct. 155, 54 L. Ed. 280; Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075; Manufacturers' Ry. Co. v. United States, 246 U. S. 457, 38 Sup. Ct. 383, 62 L. Ed. 831; Skinner & Eddy Corporation v. United States, 249 U. S. 557, 562, 39 Sup. Ct. 375, 63 L. Ed. 772; Seaboard Air Line Ry. Co. v. United States, 254 U. S. 57, 62, 41 Sup.

Ct. 24, 65 L. Ed. 129; Akron, Canton & Youngstown Ry. Co. v. United States, 43 Sup. Ct. 270, 67 L. Ed. 605 (decided February 19, 1923). The authority of this court is—

"confined to determining whether there had been violations of the Constitution, or of the power conferred by statute, or an exercise of power so arbitrary as virtually to transcend the authority conferred. Interstate Commerce Commission v. Illinois Central R. Co., 215 U. S. 452, 470; Interstate Commerce Commission v. Union Pacific R. Co., 222 U. S. 541, 547; Procter & Gamble v. United States, 225 U. S. 282, 297; Interstate Commerce Commission v. Baltimore & Ohio R. Co., 225 U. S. 326, 340." Kansas City So. Ry. v. United States, 231 U. S. 440, 34 Sup. Ct. 129, 58 L. Ed. 296, 52 L. R. A. (N. S.) 1.

There is no ground for the argument that the refusal of the Interstate Commerce Commission to, set aside rule 4 is an invasion of any constitutional right of the plaintiffs. Akron, Canton & Youngstown Ry. Co. v. United States, 43 Sup. Ct. 270, 67 L. Ed. 605 (decided Feb. 19, 1923). The court has no power under the statute to regulate interstate commerce; it can only interfere with the action of the Interstate Commerce Commission when the Commission has taken affirmative action contrary to the Constitution or the statute, or has taken such arbitrary action as virtually to transcend its authority. To grant the injunction on this debatable question seems to me to be setting up the judgment of the court upon a question of fact against the findings of the Interstate Commerce Commission, and that is beyond the power of the court.