MOBIL OIL CORPORATION, Plaintiff,

v.

The DEPARTMENT OF ENERGY, Dr. James R. Schlesinger, Secretary of Energy and Barton R. House, Assistant Administrator, Office of Fuels Regulation, Economic Regulatory Administration, Department of Energy, Defendants.

No. 79 Civ. 1727 (KTD).

United States District Court, S. D. New York.

April 9, 1979.

Donovan Leisure Newton & Irvine, New York City, for plaintiff; Thomas R. Trowbridge III, Daniel Bukovac, Charles S. Lindberg, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City, for defendants; Thomas D. Warren, Asst. U. S. Atty., New York City, Thomas H. Kemp, Dept. of Energy, Washington, D. C., of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

This action was commenced by the plaintiff, Mobil Oil Corporation [hereinafter referred to as "Mobil"], against the Department of Energy [hereinafter referred to as "DOE"], the Secretary of Energy, Dr. James R. Schlesinger, and the Assistant Administrator of Energy in the Office of Fuels Regulation, Barton R. House. The action was precipitated by the issuance of three orders by the DOE directing Mobil to sell a total of 2,466,240 gallons of motor gasoline to three designated refineries. Mobil, at the time of the orders had no contract with any of the three refiners involved for the supply of motor gasoline or crude oil.

*I. Statutory Background:*

In November 1973 Congress enacted and the President signed into law the Emergency Petroleum Allocation Act [hereinafter referred to as the "EPAA"]. 15 U.S.C. § 751 *et seq.* The stated purpose of the EPAA was to grant to the President authority to effectively deal with shortages of various petroleum products or the inequitable distribution of these products across the nation. The Act authorized the President, *inter alia*, to "promulgate a regulation providing for the mandatory allocation of [petroleum products] in amounts specified in (or determined in a manner prescribed by) and at prices specified in (or determined in a manner prescribed by) such regulation." 15 U.S.C. § 753(a).

The general objectives outlined in the Act are many and varied. Those objectives applicable to the case at bar provide that to the maximum extent practicable the regulation promulgated under 15 U.S.C. § 753(a) shall provide for:

(C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;

. . . . .

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users; and

. . . . .

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

In December 1973 the President, via Executive Order, established the Federal Energy Office [hereinafter referred to as the "FEO"], and delegated to that office all authority vested in him by the EPAA. Thereafter, the FEO adopted Mandatory Fuel Allocation Rules. These Rules, as revised, now appear at 10 C.F.R. Part 211, §§ 211.1 *et seq.* and, in pertinent part provide:

(a) To meet imbalance that may occur in the supplies of any product subject to this part, the FEO may order the transfer of specified amounts of any such product from one region or area to another. Further, the FEO may allocate any such supplies of such products among suppliers in order to remedy supply imbalances. § 211.14.

The above quoted section remains in full force and effect.

The FEO was subsequently replaced by the Federal Energy Administration which in turn gave way to the Department of Energy. Suffice it to say that DOE is now responsible for the administration and enforcement of the Mandatory Petroleum Allocation Regulations [hereinafter referred to as "the regulations"].

The practical import of the regulations is that a petroleum refiner, such as Mobil, may be ordered by the DOE to supply a specified amount of a designated petroleum product to another petroleum supplier/marketer at a set price if that supplier/marketer is otherwise unable to obtain that product. The mechanics of the mandatory allocation program, as set forth in the EPAA, dictates that any mandatory allocation to a supplier/marketer be in an amount not less than the amount sold or otherwise supplied to the supplier/marketer during the corresponding "base period." Simply stated, it is that amount of the particular product being allocated which was sold to the supplier/marketer during the comparable month during the period July 1977 through June 1978.

On the other side of this allocation equation, we have the "allocation fraction." This fraction represents the amount of a particular petroleum product available to the supplier, divided by the amount required to fulfill its base period (comparable month during July 1977 through June 1978) supply obligations. It is the percentage of the allocated product that must be delivered. This allocation fraction applies to all mandatory allocations save allocations to those supplying agricultural users in which case supply of 100 percent of their current requirement is mandated.

This action arises out of three "allocation orders" issued by the DOE which directed Mobil to deliver certain quantities of gasoline to three agricultural cooperatives due to certain "supply imbalances."

Mobil commenced this action and moved for preliminary relief to enjoin enforcement of these orders pending final determination of this suit. A hearing was held before me on April 5, 1979. Both sides were given the

opportunity to present witnesses and evidence in support of their positions. This opinion shall constitute my findings of fact and conclusions of law.

## II. Facts:

In late February and early March of this year, the Midland Cooperatives, Inc. [hereinafter referred to as "Midland"], Farmland Industries [hereinafter referred to as "Farmland"] and Land-O-Lakes, Inc. [hereinafter referred to as "Land-O-Lakes"], three agricultural cooperatives, applied to the DOE for the issuance of orders, pursuant to 10 C.F.R. § 211.14(a), directing that they be supplied with various quantities of motor gasoline for March 1979 by suppliers serving their market area. The three applications for mandatory allocations were specifically made to "remedy a supply imbalance for March 1979" in the market area of Midland, Farmland and Land-O-Lakes. In all three cases the DOE issued the requested orders directing that Mobil, together with other suppliers, deliver the specified quantities of petroleum products to the applicants.

### A. The Midland Order

Midland is a cooperative association. One of its primary functions is to provide petroleum to its agricultural customers. Midland has a substantial interest in two refineries which act as its suppliers. Due to crude oil shortages, however, these suppliers have recently been operating at less than full capacity. Consequently, Midland's percentage share from these suppliers has been reduced to such a point that it can only supply the total requirements of its agricultural customers by meeting only 5 percent of its non-agricultural obligations.

On March 8, 1979 Midland applied for the issuance of a mandatory allocation order. On March 22, 1979 Mobil was served with notice that the application had been made and if granted Mobil would be directed to supply 852,726 gallons of gasoline to Midland for March, 1979. The notice also provided that Mobil could submit comments as to its position on the proposed order by 4:30 p. m. that afternoon. The following day the allocation order issued.

### B. Farmland

Farmland is a cooperative association which also acts as a supplier to many agricultural customers. Farmland, through its wholly owned subsidiary, operates three refineries and has a 30 percent stake in another refinery. Due to crude shortages, however, its refineries were not operating at full capacity. Consequently, of its 46,300,-000 gallon agricultural requirements it could supply only 44,856,000 gallons. In addition, Farmland could meet none of its 8,925,000 gallon non-agricultural obligations.

Farmland applied for mandatory allocation on February 28, 1979. On March 16, 1979 the DOE served notice of the application and the consequences of the order should it issue. Mobil asserts that it never received the notice and therefore was given no advance warning to the issuance of the allocation order on March 20, 1979.

### C. Land-O-Lakes

Like Midland and Farmland, Land-O-Lakes is an agricultural cooperative which supplies petroleum products to many agricultural customers. It too was feeling the pinch of short crude supplies and the supply from both of its wholly owned refineries was somewhat less than capacity. Accordingly, Land-O-Lakes found itself some 1,579,000 gallons short of its 7,536,000 gallon agricultural obligations and totally deficient as to its 749,000 gallon non-agricultural obligations.

Land-O-Lakes applied for an allocation order on March 7, 1979. Notice of the "pending" application was sent to Mobil on March 22, 1979 which required Mobil to comment upon the application by 4:30 p. m. that afternoon. The allocation order issued on the following day.

Mobil has appealed from these three allocation orders to DOE's Office of Hearings and Appeals. In addition, plaintiff has applied for a stay of the allocation orders

pending determination of its appeal. There has been no determination of the stay which, under the DOE's own guidelines, need only be decided within ten days if administratively feasible. In this regard, it is interesting to note that the DOE represented to this Court at the hearing that in light of the number of appeals now pending it could not even offer an estimate as to when Mobil's request for a stay might be acted upon. It should also be noted that while Mobil's application for a stay remains pending, Mobil was required, under pain of DOE sanctions, to deliver gasoline to Midland on April 3, 1979. This delivery has already been made.

Contained in the three applications as well as the three orders in issue was the fact that there were sufficient quantities of gasoline available to the cooperatives on the open market which would enable them to meet 100 percent of both their agricultural and non-agricultural requirements. However, to secure these quantities of gasoline the cooperatives would have to go out into the open market and negotiate for the gasoline at "spot market" prices.

The spot market is that market resorted to by suppliers who do not have contractual agreements with refiners for the periodic delivery of gasoline. The advantage of spot market purchases is that in times of surplus availability the spot market price is below that charged by a refinery for a secured monthly delivery. Indeed, it was established at the hearing that suppliers pay a premium for the security of a supply contract with a refiner in times of surplus. In times of shortage, however, the spot market price tends to rise above that of gasoline delivered pursuant to a supply contract with a refiner.

In the case at bar, the spot market price available to the three cooperatives ranged from 57¢/gallon to 60¢/gallon. Under the allocation order, however, Mobil was compelled to deliver the gasoline to the cooperatives at 48.85¢/gallon. This constitutes a substantial saving to the cooperatives over the present spot market price.

Mobil attacks the allocation orders in issue on three grounds. First, Mobil argues that there was no "supply imbalance" as contemplated under the Act. Indeed, Mobil urges, this is established from the applications and orders themselves which recite that gasoline is in fact available but at a price above that which the cooperatives are willing to pay. This, Mobil contends, constitutes an erroneous interpretation of the law as well as conduct by DOE in excess of its authority as enunciated under the Regulations.

Second, Mobil argues that the orders are based upon findings which are not supported by substantial evidence.

Third, Mobil contends that it has been effectively deprived of its property without regard to the requirements of procedural due process in violation of the fourteenth amendment to the United States Constitution. In addition, Mobil argues that the DOE has failed to comply even with its own notice provisions.

Mobil concludes that for these reasons the three orders in issue are void.

The DOE, of course, contests each of the above arguments. In addition, however, the Department asserts that Mobil's failure to exhaust its administrative remedies renders the action premature and mandates its dismissal.

■■■ It is settled law that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969); *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638 (1938). However, it is quite apparent that the doctrine of exhaustion is not required in all situations. *See, e. g., Skinner & Eddy Corp. v. United States*, 249 U.S. 557, 39 S.Ct. 375, 63 L.Ed. 772 (1919); *Buckeye Cablevision, Inc. v. United States*, 438 F.2d 948, 951–52 (6th Cir. 1971). Indeed, where a case presents fundamental legal questions, the resolution of which does not require administrative expertise but rather a

judicial determination exhaustion is unnecessary. *See Skinner, supra,* 249 U.S. at 562, 39 S.Ct. 375. Here I am presented with just such a case. Mobil's primary arguments are legal ones: whether the DOE's action exceeded its statutory authority; and whether its notice procedure is violative of Due Process and its own regulatory procedures.

In addition, there is the very practical problem of what effective remedy will Mobil have left to it if it waits until its application for a stay is decided. Concededly, there is no firmly established time period within which this application must be decided. Similarly there is no express time period within which Mobil's administrative appeal must be disposed of. However, under the terms of the orders in issue if Mobil fails to comply with the directed deliveries there are certain sanctions which may be imposed.[1] Thus, under the circumstances of this case I think it would severely and unnecessarily prejudice Mobil to require exhaustion before seeking relief in this Court.

This result is not altered by the fact that Mobil did not formally request a temporary stay of the orders pending final determination thereof as provided under 10 C.F.R. § 205.127. As conceded at the hearing, the stay requested could have been construed as one for a temporary stay by the hearing officer and as such capable of immediate determination. I find the failure to do so tantamount to a denial of a temporary stay and indicative of the DOE's unwillingness to grant the formal stay requested by Mobil.

For these reasons I find that Mobil's failure to exhaust its administrative remedies is not an impediment to the instant suit.

The statutory grounds upon which a District Court may enjoin an order of the DOE are extremely narrow. See § 211 of the Council on Wage and Price Stability Act reproduced in the Note to 12 U.S.C.A. § 1904. It is provided that only upon a determination that the order is in excess of the agency's authority or is based upon findings which are not supported by substantial evidence may an injunction issue.

█ In addition, the time tested equitable requirements must also be established before the order may be enjoined: that the party seeking the injunction make a showing of irreparable harm and either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

Based upon review of these equitable considerations and my limited scope of review, I am convinced that all requirements have been satisfied and the injunction should issue.

*Statutory Requirements:*

I find that the DOE issued the allocation orders in violation of the Mandatory Petroleum Allocation Regulations and in particular in violation of § 211.14(a) thereof. The pertinent section provides that:

(a) To meet imbalances that may occur in the supplies of any allocated product, the regional or National [DOE] may order the transfer of specified amounts of any such product from one area to another or may order that different allocation fractions be sued in different areas. An area, as used in this section, means a State, a group of States within a region, or any geographical part of a State or States within a region. The National [DOE] may also order the transfer of specified amounts of any allocated product from one region to another region or may order that different allocation fractions be used in different regions to meet such imbalances. Further, the [DOE] may transfer supplies of allocated products among suppliers in order to remedy supply imbalances. .   .   .

---

1. As previously mentioned, Mobil has already made one delivery in light of these potential sanctions.

It is undisputed that in the case at bar the applications were made and the orders were issued exclusively upon § 211.14(a) in order to remedy supply imbalances. However the facts, as they have developed, support the inescapable conclusion that the applications were made and the orders issued to enable the three cooperatives to purchase gasoline at a price well below the spot market price.

On March 14, 1979 the DOE, after reviewing the applications, notified the applicants that the Champlin Petroleum Co. (Corpus Christi, Texas), the Hudson Oil Co. (Cushing, Oklahoma) and the Charter Oil Co. (Houston, Texas) had surplus gasoline available at the spot market price.[2] Despite this finding, however, the DOE determined that since resorting to the spot market would result in a 3–4 cent increase to the customers of the cooperatives this would seriously threaten their competitive viability. Accordingly, to preserve this competitive viability, Mobil was ordered to supply the needed gasoline at a price well below that quoted in the spot market. The DOE was apparently not troubled by the fact that Mobil only had barely enough gasoline to meet the needs of its own customers while these other refiners had ample supply.

■ Regardless of whether the DOE's conclusions were correct with respect to the impact on the applicants if forced to resort to the spot market for their gasoline supplies, the regulation is quite precise in its scope. It does not address (although it might have under the broad objectives of the DOE set forth in 15 U.S.C. § 753(b)) the price of surplus available, the competitive viability or the financial position of an applicant. Rather, it speaks solely to "supply imbalance." Such a regulation, which is intended to particularize statutory authority must be strictly construed. *See, e. g., Tobin v. Edward S. Wagner Co.,* 187 F.2d 977, 979 (2d Cir. 1951).

■ Strictly applying the regulation to the case at bar it is evident that the applications were made and the orders issued not to remedy any supply imbalance but solely to save the applicants from the costly spot market. Whatever economically sound policy reasons the DOE may have had in issuing the orders it is apparent that the basis of the orders was not in accordance with the precise language of § 211.14(a) and as such the orders were unauthorized. Whether the DOE may establish a regulation providing for allocations where the spot market price may negatively effect the competitive viability of a supplier is not a question before me. I hold simply that the basis upon which the DOE issued the instant orders is not expressly authorized under the regulation and, as such, was impermissible.

Moreover, in light of the precise regulation relied upon by the applicants and the DOE, I find that there was not substantial evidence based upon the record as a whole to establish that there in fact existed a supply imbalance as contemplated in the regulation. Indeed, the bulk of the evidence runs to the cost of the available surplus gasoline and its effect upon the competitive viability of the cooperatives.

There also exists a serious problem concerning the Notice purportedly given Mobil before the orders issued.

The FEA, as predecessor to the DOE, established that where administratively feasible those persons who could be adversely affected by an FEA order must be given notice of the pending order and an opportunity to voice their opposition. *See Texaco, Inc.,* 3 FEA ¶ 80,664 (1976). This procedure has also been adopted by the DOE. *Texaco, Inc.,* 1 DOE ¶ 80,106 at 80,554 (1977).

■ It is quite apparent that Mobil, for all intent and purposes was given no notice concerning the three orders in issue. The notice went out the day before the orders

---

**2.** It is interesting to note that in February, 1979 the DOE issued an order in which it determined that due to Hudson's inability to purchase sufficient supplies of crude oil Hudson was entitled to a 527,800 barrel delivery of crude by Mobil on March 1, 1979. This is the same company which now has a surplus of gasoline which it is willing to offer to the three cooperatives at the spot market price.

were signed. This I find was an inadequate period within which Mobil could coherently present its position on the orders. Moreover, where the DOE has been considering applications for almost a full month before issuing its orders it seems to me that it is certainly administratively feasible to give more than one day's notice to those who will be directly effected by the orders. I do not think a period of five days is unreasonable in this respect. Thus, the orders issued in this case—on at best 24 hours notice— were void *ab initio* and will be enjoined on this ground as well.

Moreover, the failure to provide adequate notice prior to the issuance of the allocation orders presents a serious constitutional question. It would seem that basic procedural Due Process would dictate that before Mobil be required to sell to these cooperatives it be given adequate notice of that eventuality and an opportunity to submit its position in relation thereto. Again, in light of the length of time the applications in issue were pending, I cannot accept the DOE's argument that advance notice to Mobil was not administratively feasible. In light of my findings above, however, I need not reach the constitutional question of procedural Due Process. I find that the DOE's failure to comply with its own notice procedure sufficient to render the orders void.

Accordingly, I find that the DOE exceeded its authority under § 211.14(a) as well as under its own established notice requirements.

*Equitable Requirements:*

 The DOE argues that Mobil will not suffer any irreparable harm as a result of the allocations. Indeed, it contends that since Mobil will be paid for the gasoline it delivers it will suffer no harm whatsoever. I disagree.

The testimony at the hearing revealed that in order to fulfill the directed deliveries, Mobil had two choices. First, it could cut back upon deliveries to its own customers in order to make up for this added demand. Second, it could go out into the spot market and replace that gasoline it was directed to deliver. In either case, the testimony made clear that this would cause Mobil to incur a certain financial loss that it would not suffer had the orders not issued. This cost would in turn be passed through to its customers, where permitted, and absorbed by Mobil where prior contractual agreements precluded such a pass through.[3]

Moreover, Mobil's inability to meet the demands of its own customers has recently been compounded by an accident in its Joliet, Illinois refinery. The accident at this refinery, which serves as the principal source of gasoline for the areas in which the applicants operate, has greatly reduced Mobil's ability to meet its own requirements and only heightens the likelihood that Mobil will suffer irreparable harm if it is required to comply with the orders.

Turning to Mobil's likelihood of success on the merits, I need merely refer to my findings of fact above concerning the DOE's conduct which I found to be in excess of its authority. Based upon those findings, I conclude that Mobil has indeed demonstrated a likelihood of success on the merits.

In light of the foregoing a preliminary injunction will issue with the caveat that should an administrative stay be granted the injunction will dissolve and the action stayed pending exhaustion of plaintiff's administrative appeal.

SO ORDERED.

---

**3.** This is precisely the type of situation that the DOE has determined would inflict a competitive blow to the cooperatives should they be forced to go into the spot market and purchase surplus gasoline. However, where the competitive injury is to Mobil it is somehow less compelling and in any event does not constitute irreparable harm to Mobil.