435 F.2d 1151
 NOR-AM AGRICULTURAL PRODUCTS, INC. and Morton International, Inc., Plaintiffs-Appellees,
v.
Clifford M. HARDIN, Secretary of Agriculture, G. W. Irving, Jr., Administrator Agricultural Research Service and
Harry W. Hays, Director Pesticides Regulation Division, Defendants-Appellants.
 No. 18478.
 United States Court of Appeals, Seventh Circuit.
 November 9, 1970.
 
 Howard S. Epstein, Dept. of Justice, Washington, D. C., William J. Bauer, U. S. Atty., Chicago, Ill., for defendants-appellants; Harold M. Carter, Director, Regulatory Division, Raymond W. Fullerton, Atty., Regulatory Division, Office of the General Counsel, Dept. of Agriculture, Washington, D. C., of counsel.
 Holland C. Capper, Chicago, Ill., for plaintiffs-appellees; Robert B. Gerrie, James H. Ryan, Geoffrey G. Gilbert, McBride, Baker, Wienke & Schlosser, Chicago, Ill., of counsel.
 Before SWYGERT, Chief Judge, and KILEY, FAIRCHILD, CUMMINGS, KERNER and PELL, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 This is an appeal from a preliminary injunction granted by the district court which effectually restrains the Secretary of Agriculture and other personnel of the Department of Agriculture from continuing the suspension of the registration of 17 Panogenic compounds as "economic poisons" under the Federal Insecticide, Fungicide and Rodenticide Act. 7 U.S.C. § 135 et seq. A three-judge panel of this Court, one judge dissenting, upheld the preliminary injunction. 435 F.2d 1133. Subsequently, the Government's petition for a rehearing en banc was granted.
 
 
 2
 Plaintiff Morton International, Inc. manufactures seventeen types of cyano (methylmercuri) guanadine known as Panogens. Plaintiff Nor-Am Agricultural Products, Inc. distributes Morton's Panogens. These mercury compounds are used as fungicides in treating seeds intended for planting. They were duly registered as "economic poisons" with the Secretary of Agriculture, as required by Section 4(a) of the Federal Insecticide, Fungicide and Rodenticide Act. 7 U.S.C. § 135b(a).
 
 
 3
 Pursuant to Section 4(c) of the Act (7 U.S.C. § 135b(c)), on February 18, 1970, the Department of Agriculture telegraphed plaintiff Nor-Am that its Panogen registrations had been suspended "in view of the recent accident involving the ingestion of pork from hog feed seed treated with cyano (methylmercuri) guanadine." On the same date, Dr. Harry W. Hays, Director of the Pesticides Regulation Division of the Agricultural Research Service, sent a letter to Nor-Am more fully explaining the Department's action. That letter indicated that the registration of the 17 Panogens was suspended "[t]o prevent an imminent hazard to the public from the use of cyano (methylmercuri) guanadine as a seed treatment." The letter referred to three New Mexico children who had been hospitalized in a comatose condition because they had eaten pork from hogs fed screenings and sweepings from seed previously treated with a fungicide product containing cyano (methylmercuri) guanadine. The letter added that the Panogen labels were inadequate to prevent the treated seed screenings and sweepings from being fed to hogs. Dr. Hays further said that other incidents had been reported showing that mercury treated seed screenings and sweepings had been fed to livestock or "disposed of in a manner that results in wildlife feeding on them." Finally, the letter noted that the ingestion of cyano (methylmercuri) guanadine reportedly caused irreversible injury to the central nervous system.
 
 
 4
 On March 27, 1970, the Director of Science and Education in the office of the Secretary again wrote Nor-Am. This letter elaborated the reasons for the emergency suspension:
 
 
 5
 "The action * * * was based on the fact that the directions for use and precautionary statements have failed to prevent treated seed from being used as feed. Recent reports also indicate that birds feeding on treated seed have significant levels of mercury in their tissues.
 
 
 6
 "In view of the insidious nature of alkyl mercury poisoning and the irreversible injury to the central nervous system, we firmly believe that this class of compounds should be discontinued for seed treatment. To allow new stocks to enter channels of trade would increase the risk of injury to man and other vertebrate animals."
 
 
 7
 On March 9, 1970, the registrations of similar products of other manufacturers were suspended. The suspensions prevent the shipment of these products until their registration is again permitted. Plaintiffs and the other distributors and manufacturer were not, however, required to recall existing stocks from their customers.
 
 
 8
 Administrative review of the Secretary's order was initiated on March 27, 1970, when Nor-Am requested an expedited administrative hearing as provided by Section 4(c) of the Act.[1] Instead of awaiting such a hearing, however, plaintiffs filed this suit on April 9, 1970, and quickly sought a preliminary injunction. Thereupon defendants moved to dismiss the proceeding. They claimed that the district court lacked jurisdiction to review the suspension order in advance of the hearing established by the statute; that plaintiffs had not exhausted the administrative procedures established by the Act; that the Secretary's order was a non-reviewable, discretionary act; and that the Secretary had not acted arbitrarily or capriciously. This motion was supported by an affidavit of Dr. Hays describing two specific instances of contamination of meat resulting from the consumption of mercury-treated seed by swine or cattle.[2] The affidavit noted action taken by Sweden in November 1965 to restrict the use of alkyl mercury as a result of studies indicating contamination of fish. Dr. Hays further cited an available publication describing numerous reports of accidents associated with the use of mercury in treating seeds.[3] He averred that alkyl mercury can produce permanent damage to the central nervous system, and that there are no known effective antidotes for chronic poisoning by that substance. Finally, as additional support for the emergency action, the affidavit stated that the Advisory Center on Toxicology, National Academy of Sciences, had expressed the opinion in March 1970 that all alkyl mercury compounds should be considered alike in terms of their toxicological properties, and that on February 27, 1970, the Public Health Service of the Department of Health, Education, and Welfare had recommended the cancellation of organo mercury compounds for seed treatment because of the hazard associated with their use.
 
 
 9
 At the hearing on the motion for the preliminary injunction, two Nor-Am employees and the general manager of a seed improvement association testified that Panogen products had been marketed for 20 years as a very useful fungicide seed treatment. Nothing as economical or efficacious is available as a satisfactory substitute for liquid methyl-mercury seed treatment products. Plaintiffs added a red dye to their products in order to prevent misuse of treated seed as human or animal feed. Warning labels were also prepared by plaintiffs for use on their products and on the treated seed containers. Plaintiffs' witnesses knew of no "permanent" injuries caused by Panogens.
 
 
 10
 Dr. Hays testified that when the February 18th suspension telegram was sent, to his knowledge the only permanent human injuries resulting from the use of Panogens were to the three Alamogordo, New Mexico, children. Twelve of the 14 hogs fed the treated seed near Alamogordo died. He stated that alkyl mercury compounds have a propensity to accumulate in the central nervous tissues, particularly in the brain. Such effects have not only been reported in laboratory animals but observed in pheasants, quail and other wildlife. The scientific community has discovered no effective antidote for alkyl mercury compounds. High levels of mercury have been found in the tissues of pheasants and quail in California and Ohio. He considered alkyl mercury substances used for the treatment of seed as imminently hazardous to the public because they "can be ingested by wildlife, or inadvertently used by domestic animals, or ingested by man." There is an inadequate degree of control in preventing treated seed from getting into feed or food, as evidenced by the number of grain seizure actions taken in the past by the Food and Drug Administration after finding such treated seed in grain. He felt that such treated seeds involve an undue risk to the public and that labels are inadequate to prevent any accidental misuse.
 
 
 11
 After the hearing, the district judge found that the court had jurisdiction over the subject matter of the dispute pursuant to the provisions of 28 U.S.C. § 1331, 28 U.S.C. § 1337, 28 U.S.C. §§ 2201-2202, Section 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and the "general equity powers of this Court." The district judge also determined that unless preliminary injunctive relief were granted, plaintiffs would suffer irreparable harm for which they had no adequate administrative or legal remedy, although they were "likely to prevail on the merits." The judge further concluded that preliminary relief was "consistent with the public interest." Accordingly, he held the suspension of the Panogen registrations to have been arbitrary, capricious, and contrary to law, and defendants were enjoined from taking action against plaintiffs or the Panogens in reliance on the suspension order. Defendants were also ordered to give notice that the Panogens may again be distributed and sold in interstate commerce. Finally, the preliminary injunction permitted defendants to issue notices of cancellation of the registrations of these "economic poisons" effective only after the public hearing permitted by Section 4(c) of the Act.[4] Upon consideration of this cause by the entire Court, we are of the opinion that the district court lacked power to grant this relief because the plaintiffs have not exhausted their administrative remedy.
 
 
 12
 The fundamental provisions regulating judicial review of administrative actions are contained in the 1946 Administrative Procedure Act. 5 U.S.C. § 701 et seq. Section 10(c) of that Act governs which agency actions shall be reviewable:
 
 
 13
 "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. * * *" 5 U.S.C. § 704.
 
 
 14
 * In determining the status of the instant suspension in the light of the Administrative Procedure Act, we must turn first to the pertinent provisions of the Federal Insecticide, Fungicide and Rodenticide Act. 7 U.S.C. § 135 et seq. The 1964 amendments to Section 4 of that Act (Pub.L. 88-305, 88th Cong., 2nd Sess.) greatly strengthened the ability of the Secretary of Agriculture to take affirmative action protecting the public from hazardous and mislabeled commodities. Congress enacted new powers to deny, suspend, and cancel registrations where the Secretary had previously been compelled to accede to registration under protest should he be faced with an adamant demand. In Section 4(c), Congress also added hearing procedures guiding the exercise of these new powers. 7 U.S.C. § 135b(c). The Secretary was required to give notice to the appellant or registrant of asserted defects and, upon request, was obliged to refer the dispute to an "advisory committee" of experts or to a public hearing. In the event of an adverse determination by the Secretary after consideration of the matter by an advisory committee, the applicant or registrant could again request a public hearing.
 
 
 15
 Notwithstanding these procedural specifics, Congress provided for emergency action by permitting immediate suspension of registration in the face of "an imminent hazard to the public." 7 U.S. C. § 135b(c). In almost the same breath, however, Congress recognized the need for prompt determination of the accuracy of the Secretary's judgment and provided that in the wake of an emergency suspension the Secretary should
 
 
 16
 "give the registrant prompt notice of such action and afford the registrant the opportunity to have the matter submitted to an advisory committee and for an expedited hearing under this section."
 
 
 17
 The 1964 Amendments also added special provisions for judicial review of agency actions directed toward denial, suspension, or cancellation of the registration of "economic poisons." After describing the Secretary's expanded powers and their mode of exercise, Section 4(c) states that
 
 
 18
 "[f]inal orders of the Secretary under this section shall be subject to judicial review, in accordance with the provisions of subsection d. * * *" 7 U. S.C. § 135b(c).
 
 
 19
 Section 4(d) outlines the mechanics, forum, and character of the judicial review contemplated by Congress:
 
 
 20
 "d. In a case of actual controversy as to the validity of any order under this section, any person who will be adversely affected by such order may obtain judicial review by filing in the United States court of appeals for the circuit wherein such person resides or has his principal place of business, or in the United States Court of Appeals for the District of Columbia Circuit, within sixty days after the entry of such order, a petition praying that the order be set aside in whole or in part. * * * The findings of the Secretary with respect to questions of fact shall be sustained if supported by substantial evidence when considered on the record as a whole, including any report and recommendation of an advisory committee. * * * The commencement of proceedings under this section shall not, unless specifically ordered by the court to the contrary, operate as a stay of an order. The court shall advance on the docket and expedite the disposition of all causes filed therein pursuant to this section." 7 U.S.C. § 135b(d).
 
 
 21
 Together, these statutory provisions do not expressly or impliedly contemplate immediate review of emergency suspensions by either district or appellate courts. The reference to review of "any order" contained in Section 4(d) indicates no broadening of the class of reviewable orders under Section 4(c), for judicial review must conform to the nature of the order, "the context of the Act," and "the relation of judicial power to the subject-matter." Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 106, 68 S.Ct. 431, 434, 92 L.Ed. 568; see also, Federal Power Commission v. Metropolitan Edison Co., 304 U.S. 375, 384-385, 58 S.Ct. 963, 82 L.Ed. 1408. Implicit in Section 4(d) is the limitation on judicial review resulting from the specific extension on review in Section 4(c) only to "final orders of the Secretary." Section 4(d) thus merely details the prodecural aspects and standards of the judicial review permitted by Section 4(c). Cf. McManus v. Civil Aeronautics Board, 286 F.2d 414 (2d Cir. 1961).
 
 
 22
 Equally unacceptable is the contention that an emergency suspension order is a "final order" of the Secretary made reviewable by Section 4(c). That limitation on judicial review serves to avoid delay and interference with agency proceedings by confining review to orders effectively terminating administrative adjudication. Cf. Foti v. Immigration and Naturalization Service, 375 U.S. 217, 224, 232, 84 S.Ct. 306, 11 L.Ed.2d 281. The suspension order and surrounding procedural scheme of the 1964 Statute refute the conclusion of finality under this Act. See Jaffe, Judicial Control of Administrative Action, p. 418 (1965). By its very nature and within the explicit purview of Section 4(c), the emergency suspension of registration represents a tentative, temporary measure. This interlocutory character is unaltered by the inclusion of the customary prerequisite that the hazard be "imminent." It is preliminary to more thorough administrative consideration of the hazardous condition of the "poisons." The statute expressly contemplates special proceedings to follow suspension post-haste. These include the informal submission of the disputed matters to an advisory committee of experts whose report and recommendations become part of the record for consideration at the expedited hearing and, under Section 4(d), on judicial review. The emergency suspension becomes final only if unopposed or affirmed, in whole or in part, by subsequent decision based upon a full and formal consideration.
 
 
 23
 The provisions for judicial review spelled out in the statute also compel the inference that the emergency action of the Secretary by no means culminates administrative proceedings on the matters of registration of an "economic poison." Review is not "de novo" in a trial court; rather, it is based on the substantiality of the evidence in the administrative record and is before the appropriate court of appeals. Such provisions with respect to judicial review are classic indications that Congress intended administrative adjudications to proceed to conclusion prior to judicial scrutiny.
 
 
 24
 We conclude that Congress intended to confine judicial review of registration disputes under Section 4(c) of the Act to final orders of the Secretary culminating administrative adjudication. Under this Act, the emergency suspension of registration preceding such adjudication does not constitute such a final order and is therefore not "reviewable by statute" within Section 10(c) of the Administrative Procedure Act, supra, p. 1155.
 
 II
 
 25
 Plaintiffs contend that this order should nevertheless entitle them to review under the "final agency action" provision of Section 10(c) of the Administrative Procedure Act. They argue that suspension of registration by the Secretary possesses sufficient "finality" as an administrative action to warrant immediate recourse to the courts despite its status as a preliminary act within the framework of Section 4(c) of the Federal Insecticide, Fungicide and Rodenticide Act. Suspension, they urge, immediately and drastically affects their rights and interests as greatly as formally finalized cancellation. They suggest that neither subsequent agency proceedings nor judicial review established by Section 4(d) adequately test the Secretary's determination of "imminent hazard to the public." Unless they are permitted this exceptional remedy, they claim that the Secretary's findings amount to autonomous discretion.
 
 
 26
 Under Section 10(c) of the Administrative Procedure Act, the concept of finality of administrative action encompasses a complex array of considerations which may vary in accordance with the character and activities of the administrative agency, and with the nature and role of the agency action from which judicial review is sought. See Abbott Laboratories v. Gardner, 387 U.S. 136, 148-156, 87 S.Ct. 1507, 18 L.Ed.2d 681.[5] The flexibility of the finality concept does not, however, permit facile disregard of the purposes of congressional delegation of power and of the clear procedural scheme delineated in this particular statute. The importance of executive and administrative autonomy, as well as respect for the will of Congress, was observed in Aircraft & Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 767-768, 67 S.Ct. 1493, 1500-1501, 91 L.Ed. 1796:
 
 
 27
 "The very purpose of providing either an exclusive or an initial and preliminary administrative determination is to secure the administrative judgment either, in the one case, in substitution for judicial decision or, in the other, as foundation for or perchance to make unnecessary later judicial proceedings. Where Congress has clearly commanded that administrative judgment be taken initially or exclusively, the courts have no lawful function to anticipate the administrative decision with their own, whether or not when it has been rendered they may intervene either in presumed accordance with Congress' will or because, for constitutional reasons, its will to exclude them has been exerted in an invalid manner. To do this not only would contravene the will of Congress as a matter of restricting or deferring judicial action. It would nullify the congressional objects in providing the administrative determination. In this case these include securing uniformity of administrative policy and disposition, expertness of judgment, and finality in determination, at least of those things which Congress intended to and could commit to such agencies for final decision."
 
 
 28
 The function of the Secretary's emergency power, as well as the practical exigencies of coordinating administrative and judicial machinery, militates against avoiding the prescribed procedures. The emergency suspension of registration of an economic poison under Section 4(c) involves highly discretionary administrative action with deeply rooted antecedents in the realm of public health and safety. In subtle areas of regulation, summary emergency action frequently precedes formal administrative or judicial adjudication. See, e. g., Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 599-600, 70 S.Ct. 870, 94 L.Ed. 1088; cf. Phillips v. Commissioner of Internal Revenue, 283 U.S. 589, 596-597, 51 S.Ct. 608, 75 L.Ed. 1289; Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892; Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030. Where, as here, Congress follows discretionary preliminary or interlocutory agency action with specially fashioned adjudicative machinery, strict observance of the prescribed procedure prior to judicial intervention is compellingly indicated.
 
 
 29
 Precipitous judicial review of this tentative judgment would at best be a difficult matter of dubious social benefit. Moreover, it strains administrative resources at a stage in the process which is most delicate and to a degree which may ultimately be rendered unnecessary by ordinary agency operations, both formal and informal. Even the limited review here contemplated nullifies the need or utility of the further agency action desired by Congress. The administrative process is interrupted before issues have been crystalized and narrowed and without affording opportunity for application of technical expertise and informed judgment. As this record demonstrates, judicial review at this stage requires factual elaboration by the district court. Such bifurcation and duplication of governmental resources and efforts demontrates the wisdom of judicial restraint, since once the district court has inserted itself into the process, it becomes wasteful or pointless to return the matter to the agency. Securities and Exchange Commission v. R. A. Holman & Company, Inc., 116 U.S.App.D.C. 279, 323 F.2d 284, 287 (1963), certiorari denied, 375 U.S. 943, 84 S.Ct. 350, 11 L.Ed.2d 274. Judicial scrutiny of the accuracy and correctness of the Secretary's emergency suspension largely abrogates need of expedition of further agency proceedings. At the very least, however, the agency must postpone its further proceedings (even if it plans ultimately to expedite them) pending the outcome of judicial review. Not only may this aggravate the harm suffered by the innocent registrant by prolonging litigation, but it unnecessarily encumbers governmental efforts and may have the adverse effect of coloring further agency actions.
 
 
 30
 Nothing in Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681, relied upon by plaintiffs, suggests a contrary conclusion regarding the reviewability of the instant suspension order. Abbott Laboratories was an action for essentially declaratory review of a strictly legal issue concerning the validity of a regulation. The rule-making process of the agency had culminated, and judicial review would neither impede enforcement of the regulation nor interfere with administrative proceedings. Entirely different considerations are operative where, as here, judicial review is sought of the factual basis supporting an emergency order which itself initiates clearly defined adjudicatory proceedings within the agency. These distinctions were expressly recognized by the Court in Abbott Laboratories when it distinguished Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088, by pointing out that the
 
 
 31
 "drug manufacturer in Ewing was quite obviously seeking an unheard-of form of relief which, if allowed, would have permitted interference in the early stages of an administrative determination as to specific facts, and would have prevented the regular operation of the seizure procedures established by the Act." 387 U.S. at p. 148, 87 S.Ct. at p. 1515.
 
 
 32
 Similarly, we find distinguishable and inapplicable the holding in Environmental Defense Fund, Incorporated v. Hardin, 428 F.2d 1093, 1098-1099 (D.C. Cir. 1970), as it might relate to action by the Secretary of Agriculture in suspending registrations of an economic poison. There the Secretary of Agriculture refused to issue notices of emergency suspension or cancellation for DDT and the Court concluded that due to his inaction there were no further administrative proceedings available to the interested parties under the Federal Insecticide, Fungicide and Rodenticide Act. In contrast, issuance of a notice of emergency suspension under Section 4(c) of the present Act specifically results in further formal agency proceedings. These differing administrative consequences command respect and negate the present applicability of the conclusion reached by the court in Environmental Defense Fund that "[n]o subsequent action can sharpen the controversy arising from a decision by the Secretary * *." 428 F.2d at p. 1098.
 
 
 33
 Judicial review of the Secretary's suspension order is inconsistent with the procedural remedies created by Congress for such an occasion. It is also at odds with the restraint courts have long exercised in dealing with preventive measures available to agencies charged with protecting such sensitive areas of public welfare. Here the plaintiffs have not yet exhausted their statutorily prescribed administrative remedies and there has as yet been no "final agency action" within Section 10(c) of the Administrative Procedure Act.
 
 III
 
 34
 In addition to the statutory avenues of review, plaintiffs urge that the equity powers of the court have been properly invoked to prevent irreparable injury caused by the suspension order.
 
 
 35
 The circumvention of clearly prescribed administrative procedures by awarding equitable relief is an exceptional practice. As explained in Air-craft & Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 773-774, 67 S.Ct. 1493, 1503-1504, 91 L.Ed. 1796, the rule that administrative remedies may occasionally be by-passed to protect strong private interests from irreparable harm
 
 
 36
 "is not one of mere convenience or ready application. Where the intent of Congress is clear to require administrative determination, either to the exclusion of judicial action or in advance of it, a strong showing is required, both of inadequacy of the prescribed procedure and of impending harm, to permit shortcircuiting the administrative process. Congress' commands for judicial restraint in this respect are not lightly to be disregarded."
 
 
 37
 Plaintiffs have failed to establish such an irremediable threat to sufficiently strong interests to warrant equitable intercession at this juncture.
 
 
 38
 We cannot accept the verdict of the judge below that the administrative remedies are inadequate. There is no contention that the Secretary has usurped powers beyond his jurisdictional scope. Cf. McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547; Skinner & Eddy Corp. v. United States, 249 U.S. 557, 39 S.Ct. 375, 63 L.Ed. 772. Unlike Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210, plaintiffs can assert their claims as a practical matter, informally and formally, without judicial interruption of agency practices. Nothing in the nature of the objections raised by plaintiffs here suggests that exhaustion of agency remedies would be an exercise in futility. Cf. McKart v. United States, 395 U.S. 185, 197-198, 89 S.Ct. 1657, 23 L.Ed.2d 194. The administrative agency has shown no incapacity or unwillingness to correct a demonstrably false suspension without advice from the courts. We have no basis for concluding that expedition by the agency would be any less effective than expedition by the judiciary. Finally, failure of the courts to entertain a complaint at this time does not foreclose judicial review entirely. See Yakus v. United States, 321 U. S. 414, 64 S.Ct. 660, 88 L.Ed. 834; cf. McKart v. United States, supra, 395 U.S. at p. 197, 89 S.Ct. 1657; Environmental Defense Fund, Incorporated v. Hardin, 428 F.2d 1093 (D.C. Cir. 1970).
 
 
 39
 The primary interests threatened in this case are not public but private. They are interests of property rather than of life or liberty. Although plaintiffs claim danger to farmers and consumers from removal of their products, their direct and immediate concern is the impact of suspension upon their businesses. In Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 51, 58 S.Ct. 459, 464, 82 L.Ed. 638, Justice Brandeis observed that
 
 
 40
 "the rule requiring exhaustion of the administrative remedy cannot be circumvented by asserting that the charge on which the complaint rests is groundless and that the mere holding of the prescribed administrative hearing would result in irreparable damage."
 
 
 41
 We do not demean plaintiffs' possible losses when noting moreover, that the temporary suspension affects business profits, not the very existence of the commodities plaintiffs seek to purvey. Where public health and safety demand emergency removal of a commodity from the market, even unrecoverable financial losses incurred pendente lite must be deemed an expense of the litigation itself. See Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088; cf. Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030.
 
 
 42
 Congress was not bound to supply the optimal protection to registrants affected by emergency suspensions. Congress balanced the public and private interests when it fashioned not only the Secretary's discretionary power but also the administrative procedures to follow exercise of that power. The Court's conclusion in Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 601-602, 70 S. Ct. 870, 874, 94 L.Ed. 1088, is applicable to this case with equal force:
 
 
 43
 "The purpose of the * * * provision is plain. It is to arrest the distribution of an article that is dangerous, or whose labeling is fraudulent or misleading, pending a determination of the issue of adulteration or misbranding. The public therefore has a stake in the jurisdictional issue before us. If the District Court can step in, stay the institution of [suspensions], and bring the administrative regulation to a halt until it hears the case, the public will be denied the speedy protection which Congress provided by [suspension]. * * What we do today determines the jurisdiction of the District Court in all the cases in that category. If the court in the present case can halt all [suspensions] but one, so can the court in other cases. The means which Congress provided to protect consumers against the injurious consequences of protracted proceedings would then be seriously impaired. Congress weighed the potential injury to the public from misbranded articles against the injury to the purveyor of the article from a temporary interference with its distribution and decided in favor of the speedy, preventive device of [suspension]. We would impair or destroy the effectiveness of that device if we sanctioned the interference which a grant of jurisdiction to the District Court would entail."
 
 
 44
 If this preliminary injunction were approved, other litigants could obtain district court threshold review by parroting plaintiffs' claim that the Secretary had acted arbitrarily and capriciously in suspending their registrations, even though Sections 4(c) and 4(d) specify that review shall only be in the courts of appeals after action by the advisory committee and then by the Secretary. We should not countenance such an evasion of the review procedure provided by Congress in this statute.[6] In reaching this conclusion, we express no opinion on the merits of the controversy between these parties concerning the registration of Panogens.
 
 
 45
 The preliminary injunction is dissolved and the case is remanded to the district court with instructions to dismiss the complaint.
 
 
 46
 Reversed.
 
 
 
 Notes:
 
 
 [1]
 At the hearing below, the Assistant United States Attorney advised the court that this suspension matter had been placed on the Department's calendar on an expedited basis. Its processing has been interrupted by this litigation
 
 
 [2]
 The first and most serious instance described by the affidavit involved the afore-mentioned severe mercury poisoning of members of an Alamogordo, New Mexico, family in January 1970. The members of that family had ingested pork from contaminated hogs which had been fed mercury-treated seeds. The second instance of meat contamination involved seven Oregon cattle fed mercury-treated seed by a farmer and consequently declared unfit for human consumption
 
 
 [3]
 Bidstrup,Industrial Poisoning with Mercury.
 
 
 [4]
 In addition to the provision for immediate suspension of registration to prevent an imminent hazard to the public, which is the subject of this suit, Section 4(c) permits cancellation of registrations. The cancellation is effective 30 days after service of notice by the Secretary upon the registrant "unless within such time the registrant (1) makes the necessary corrections; (2) files a petition requesting that the matter be referred to an advisory committee; or (3) files objections and requests a public hearing." 7 U.S.C. § 135b(c). We have been advised that the Secretary issued such notices of cancellation on August 4, 1970, nine days before this rehearing was granted, but an advisory committee was not convened to process the matters as of September 30, 1970, possibly because of the pendency of this rehearing
 
 
 [5]
 See generally, 3 Davis, Administrative Law Treatise, Chs. 20, 21 (1958); Jaffe, Judicial Control of Administrative Action, Ch. 10 (1965)
 
 
 [6]
 Compare the similar suspension provision in the Food, Drug and Cosmetic Act (21 U.S.C. § 355(e)) which would also be thwarted if the reasoning below were applied to it
 
 
 
 47
 PELL, Circuit Judge (dissenting).
 
 
 48
 After careful consideration of additional briefs and oral argument and of the present majority opinion of this court, I remain completely unpersuaded that an incorrect result was reached in the majority opinion by the three-judge panel of this court which first heard the appeal. Therefore, I must respectfully record this dissent.
 
 
 49
 I adhere to the views and propositions previously expressed in the majority opinion of July 15, 1970, which opinion, so as not to extend unduly the length of this dissent, I incorporate herein by reference. Nor-Am v. Hardin, 435 F.2d 1133 (7th Cir. 1970).
 
 
 50
 However, because of the wide-spread and significant implications of the present majority decision, establishing, as I believe it does, an invitation to government by administrative fiat, I feel compelled to further observations.
 
 
 51
 I join my brothers of the present majority opinion in allegiance to the general proposition that administrative remedies should be exhausted prior to judicial review and that such review should not interrupt and should not interfere with the full exercise of administrative expertise prior to finality thereof. However, as indicated in the original opinion in this appeal of July 15, 1970, there was finality involved in the decision of the secretary determining that Panogen constituted an imminent hazard to the public, and I reiterate the reasons expressed in the original opinion in support of that proposition.
 
 
 52
 The crucial and basic question here involved, however, in my opinion, is whether judicial intervention is permissible in the event of arbitrary and capricious administrative action. I do not find in the present majority opinion confrontation with this issue. The record before us cries out that the governmental suspension of Panogen as an economic poison was bottomed on the emotional impact of a single incident, one which was tragic and yet one which there was no reason for thinking would be repeated. When a product has been successfully used on the market for more than twenty years and is essential for agriculture, and when there has been no other recorded incident that the use of the product has been detrimental to the public health, I can reach no conclusion other than that the suspension was, in the technical and legal sense, an arbitrary and capricious one.[1]
 
 
 53
 In considering the definition of arbitrary, the Supreme Court has given recognition to the standard dictionary definition such as "without adequate determining principle" and "arrived at through an exercise of will or by caprice, without consideration or adjustment with reference to principles, circumstances, or significance, * * * decisive but unreasoned; * * *." United States v. Carmack, 329 U.S. 230, 243-244 n. 14, 67 S.Ct. 252, 258, 91 L.Ed. 209 (1946). One of the dictionary definitions recognized by Carmack was "apt to change suddenly." The facts on the record of this appeal, which will be further developed hereinafter, point clearly to the conclusion that the administrative suspension of the registration of Panogen was without adequate determining principle necessarily applicable to a determination that Panogen was an imminent hazard to the public and that said action was arrived at through an exercise of will without any proper consideration with reference to principle, circumstances or significance. In other words, it was decisive and therefore had all the elements of finality but was unreasoned.
 
 
 54
 As was developed in the opinion of July 15, 1970, on the evening of February 17, 1970 there was a national television broadcast on the Huntley-Brinkley newscast which discussed and portrayed the Alamogordo, New Mexico tragic incident. On the very next day, the registration was suspended. It takes no particular application of judicial knowledge to be aware of the nationwide coverage achieved by the particular television program. It takes no great perception in reading the record to conceive the emotional impact involved when three young children are rendered virtually vegetables.
 
 
 55
 When it is considered that the particular product had been on the market for over twenty years and had been registered as an economic poison for many years as required by the statutes in effect, the sudden suspension in the context of the emotional impact of the television program can only point, by the sudden change, to capricious action.
 
 
 56
 In Carmack, supra at p. 243, 67 S.Ct. 252, the Supreme Court said in the case before it that it was unnecessary to determine whether a particular selection could have been set aside by the courts as unauthorized by Congress if the officials had acted arbitrarily and capriciously so that their action was without adequate determining principle or was unreasoned. The Court stated that the procedure followed in making the selection involved in Carmack showed extraordinary effort to arrive at a fair and reasoned conclusion. I find the action of the secretary in reaching the extraordinarily stringent decision achieved here did not exhibit even an ordinary effort to arrive at a fair and reasoned conclusion.
 
 
 57
 In my view this is not merely a situation where a reviewing court could reach a decision contrary to that reached by the agency. That is not deemed arbitrary and capricious in the legal sense. Pauley v. United States, 419 F.2d 1061, 1066 (7th Cir. 1969). Rather, here the action seems insupportable on any rational basis.
 
 
 58
 In the opinion of July 15, 1970, reference is made to the reasoning of Congress in according to administrative officials the drastic and emergency power of acting with regard to matters determined to be an imminent hazard to public health. (See p. 1142 of 435 F.2d). The rationale of congressional pronouncements in this respect seem obvious. If a new product were to come on the agricultural market, as to which there had been no experience in relation to the public health, and the product in its marketed form when used was found to emanate fumes which caused serious and painful skin irritations, all of which resulted from lack of proper testing prior to marketing, obviously some agency of the government should have the authority to remove the product instanter from the market. Even here, of course, there should eventually be a hearing to determine with administrative expertise the various factual questions such as whether the product when properly manufactured did in fact cause the skin irritation, whether the product when properly used would produce the fumes and the value of the product not only to the agricultural community but to the public at large. Such a hypothetical situation which would occasion the use of the drastic emergency powers inherent in the imminent hazard determination does not by any realistic view exist in the case before us.
 
 
 59
 As this dissent was being prepared, the Nobel Peace Prize was awarded to an American agricultural scientist for studies that developed wheat strains giving bigger yields in older types, thereby helping the world's hunger problems. The scientist had pioneered in breeding new varieties of disease-resistant wheat plants. Disease resistance was the purpose of Panogen's development. Such research highlights the belief of many informed individuals that three or four more decades will bring upon us a real crisis in feeding the world's population. Whether, as might be argued, the minimal dangers to a few people through misuse of a valuable agricultural product is less important than the overall threat of eventual failure to be able to feed the world is not a problem to which this court need address itself. It is a problem, however, to which in my opinion the administrative agency should have addressed itself, and in depth, prior to exercising its extraordinary power of immediate suspension.
 
 
 60
 At the hearing in the district court on a motion for the preliminary injunction, the evidence, which was not contradicted, reflected that no product as economical nor as efficacious was available as a satisfactory substitute for liquid methylmercuri seed treatment.
 
 
 61
 Obviously, of course, the work of a governmental department is easier when the opinion is entertained that if some product is hazardous to the public it should simply be taken off the market, putting the manufacturer in the broad sense on the defensive with regard to the product. This approach, however, ignores any significance in the crucial word "imminent."
 
 
 62
 The Agricultural Department is obviously aware of the significance of the word "imminent" as reflected in the action of a director of a different division of the department in a report to the United States Court of Appeals for the District of Columbia Circuit which had ordered the Secretary of Agriculture either to ban the use of DDT or to state to the court its reasons for not doing so. BNA Environment Reporter, June 5, 1970, p. 115.
 
 
 63
 In the Department's statement to the court the following was set forth:
 
 
 64
 "The scientific evidence now available does not establish that the use of DDT constitutes an imminent hazard to human health.
 
 
 65
 "Scientific evidence indicates that there are some adverse effects upon certain species of fish and wildlife but such effects do not constitute an imminent hazard to fish and wildlife or the environment.
 
 
 66
 "DDT has indisputably important and beneficial uses in connection with human health and agriculture, and there are not yet available suitable substitutes for all essential uses.
 
 
 67
 "The use of DDT should continue to be reduced in an orderly, practical manner which will not deprive man-kind of uses which are essential to the public health and welfare." BNA Environment Reporter, July 3, 1970, p. 238.
 
 
 68
 In this parallel factual situation, which lacked the emotional impact of the Alamogordo incident, the Secretary of Agriculture displayed an awareness of the differentiation between something which might or might not be ultimately hazardous to the public and something which was imminently hazardous to the public.
 
 
 69
 The lack of awareness of the crucial necessity of imminency is reflected in the present majority opinion which sets forth the evidence produced by the government on the hearing of a motion for a preliminary injunction. The government testimony reflected that the only permanent human injuries to the knowledge of the department were to the three Alamogordo children. Hogs owned by the children's father had died, but they had been fed poisoned feed as a result of a misuse of the treated seed which was never intended for feed purposes. The testimony further indicated that the effect of mercury compounds had been reported in laboratory animals. But again this is not surprising because obviously these laboratory animals had been fed such products, and no contention has been made that the injection of mercury products into any living organism will not produce deleterious results. Next, the testimony indicated that the effects had been observed in pheasant, quail and other wildlife, but the effects of DDT had also been so observed. The scientific community, according to the testimony, has discovered no effective antidote for alkylmercury compounds. In varying degrees, this is no doubt true of many poisonous substances, but they are tolerated if in their proper use they serve a worthwhile purpose. The testimony next referred to the fact that there had been a number of grain seizure actions taken by the Food and Drug Administration after discovering treated seed in grain. This fact and the accompanying fact that there had been no known additional instances of animals or humans suffering from ingestion of Panogen indicates that the red dye which the manufacturers of Panogen had put on their products was effective to avoid misuse.
 
 
 70
 This then was the evidence supporting a determination of imminent hazard to the public, and it seems clear that the evidence wholly fails to support the determination of imminency.
 
 
 71
 In this country I dare say there are very few barns, medicine chests or even kitchen cupboards which do not have products contained therein which would be extremely detrimental to people if misused. In the case on appeal the evidence amply supports a misuse of the product in the Alamogordo situation. The fact that misuse may result in damage does not in my opinion make a product imminently hazardous in the absence of an evidentiary showing that such misuse is frequent or was reasonably likely to occur.
 
 
 72
 The doctrine of exhaustion of administrative remedies is pragmatic in origin. It wears no constitutional halo. I can conceive no valid justification for its wooden and mechanistic application where the expertise which the rationale of the rule seeks to protect is so singularly not exercised, as in the case before us. Nor does the practicality of the doctrine in the overall scheme of governmental operation necessarily require slavish homage to it.
 
 
 73
 While the present majority opinion concludes that there was no finality in the determination of the secretary that Panogen was an imminent hazard to the public and therefore judicial intervention was not appropriate, I must also respectfully disagree with this conclusion for the reasons set forth in the opinion of July 15, 1970. In addition, it is to be observed that in one sense no action of an administrative body or even of a court is final since the same body or court can subsequently take other different action. However, this does not preclude finality impact in an order such as the one here involved. Further administrative proceedings in the present case will be for a determination of whether there is a hazard to the public which would require preclusion from the marketplace. On the other hand, the issue which precipitated this litigation, determined without hearing and indeed without proper consideration, was not the hazard question per se but the imminent hazard question.
 
 
 74
 The present majority opinion expresses fear of the effects of interference with the administrative process by premature judicial intervention. We are dealing, however, with a narrow issue in that we are concerned with the imminent hazard situation only.
 
 
 75
 This emergency power is one which it seems reasonable to assume is used only sparingly, or at least should be used sparingly, where a genuine imminent hazard situation exists which would be detrimental to the public. Such cases will arise only infrequently. But when the emergency power is exercised, the administrative agency should be, in my opinion, subject to judicial intervention and review, likewise on an immediate basis, if the emergency action was taken without adequate determining principle or was unreasoned.
 
 
 76
 One further aspect of the case before us requires consideration. The district judge, who heard the testimony and observed the witnesses, made certain findings of fact and conclusions of law in his order granting the preliminary injunction. He found that the suspension of the Panogen seed treatment products on the basis that they constituted an imminent hazard to the public was arbitrary and capricious in that there was no evidence to support the alleged incidents nor was there any evidence that Panogen was so unsafe as to create an imminent hazard to the public which could not be corrected by means other than suspension without a hearing. The present majority opinion does not consider the question of whether the statement that the action was arbitrary and capricious was a finding of fact, a conclusion of law or a mixture of the two.
 
 
 77
 While in the opinion of July 15, 1970 we did assume arguendo with regard to whether a motion to dismiss admitted that the actions were arbitrary and capricious that these were legal conclusions, the determination of the matter was not necessary for the result reached. Now that the district court, however, is being reversed, it is necessary that a determination be made on this issue.
 
 
 78
 The necessity of meeting this issue arises from Rule 52(a) of the Federal Rules of Civil Procedure, which in effect states that findings of fact should not be set aside unless clearly erroneous and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. Where the trial court findings of fact are not clearly erroneous they must stand undisturbed on appeal. G. C. Kirn Advertising Sign Co. v. Admiral Corp., 170 F.2d 499, 501 (7th Cir. 1948). See also Dearborn National Casualty Co. v. Consumers Petroleum Co., 178 F.2d 277, 279 (7th Cir. 1949). The question of what is a finding of fact and what is a conclusion of law is often a difficult one of solution.
 
 
 79
 Professor Wright in 2B Barron & Holtzoff, Federal Practice & Procedure, § 1137 (1969 pocket part p. 203), states the following:
 
 
 80
 The Ninth Circuit has endeavored to formulate a test for distinguishing between findings of fact and conclusions of law. "A finding of fact, to which the clearly erroneous rule applies," it says, "is a finding based on the `fact-finding tribunal's experience with the mainsprings of human conduct.' A conclusion of law would be a conclusion based on application of a legal standard." [footnote citation is to Lundgren v. Freeman, 307 F.2d 104, 115 (9th Cir. 1962)] On this analysis it concluded that a finding of mutual mistake was derived, in part at least, from the trial judge's experience with human affairs, and thus could not be set aside unless clearly erroneous.
 
 
 81
 On the foregoing basis it would appear that the determination that action was arbitrary and capricious is a finding based on the mainsprings of human conduct rather than on the application of a legal standard; and that being so, I am not persuaded that the majority opinion has developed any basis for a suspension of Rule 52(a), particularly in view of the fact that this is an appeal from the granting of an interlocutory injunction.
 
 
 82
 In any event, however, I do not deem it necessary in order to sustain the trial court's granting of the motion for a temporary injunction that we determine that the characterization as arbitrary and capricious was fact or law because independently the record does, in my opinion, show that the action was arbitrary and capricious.
 
 
 83
 On rehearing, counsel for the government was asked if the government contended that there was no immediate judicial review of arbitrary and capricious action on the part of the secretary. Counsel parried the question by stating that it was inconceivable to him that the secretary could act arbitrarily and capriciously. When pressed with the hypothetical question and reminded that historians had recorded the fact that arbitrary and capricious action on the part of governmental leaders was not unknown, counsel conceded that if the secretary had committed arbitrary and capricious action, which he still would not concede, it would seem to be the basis for prompt judicial intervention.
 
 
 84
 The result for which I contend in this dissenting opinion, which was the result reached in the opinion of July 15, 1970, would not have stopped administrative procedures on the issue of whether Panogen should eventually be removed from the market. The opinion carefully pointed out that the decision would permit a rational and objective administrative procedure to go forward, giving due weight to all phases of the matter, including that which is probably of long range concern to the government, the ecological aspects. The opinion made it possible for the determination to be made with a thorough airing of the adequate determining principles. United States v. Carmack, 329 U.S. 230, 243, 67 S.Ct. 252, 91 L.Ed. 209 (1946).
 
 
 85
 A recent news item concerns a charge by a radiologist to the effect that radio-active exhaust gas from a nuclear power reactor in an electrical generating plant in Illinois had caused an alarming increase in infant mortality in that state. The Atomic Energy Commission denied the charge. If statutory authority were accorded to this or to any other agency to take action without notice in case of imminent hazard, the commission could have issued an order shutting down the plant. Such drastic power, which is still exercised by human beings, could well lead to government by whim. The relationship between the public health and the side effects from the operation of various types of manufacturing operations as well as from the product made by such operations is, because of burgeoning population, bound to be a matter of greater and greater intensive study. Charges can be easily made, often times by a person seeking publicity. There is a strong undercurrent of emotional appeal in these charges, particularly when children and the impairment of their health is involved. The emergency power is one which should not be invoked without real and convincing cause and not on a prima facie basis.
 
 
 86
 Even with regard to the Alamogordo incident, which apparently was the real basis of the secretary's order of suspension, this was not an established fact but was assumed for the purpose of the case to have been caused by the Panogen. As the district judge stated on the assumption basis, "the record establishes a unique combination of circumstances which are unlikely to recur, including diversion of treated material to animal feed, disregard of label cautions and warnings, slaughter of a hog after it showed signs of illness, and continued eating by a single family of contaminated food from a slaughtered hog after twelve of the same pen of hogs had died and two had become blind."
 
 
 87
 Just as counsel for the government was unwilling to concede the possibility of arbitrary and capricious action on the part of the secretary, the courts generally have apparently been somewhat reluctant to find that governmental action was so bottomed. Implicit, however, in the cases has been the recognition that if this were the fact the administrative action would be struck down. See, for example, United States v. Carmack, 329 U.S. 230, 243, 67 S.Ct. 252, 91 L.Ed. 209 (1946); Pauley v. United States, 419 F.2d 1061, 1066 (7th Cir. 1969).
 
 
 88
 Arbitrary or capricious action must be set aside. Lewis v. Flemming, 176 F. Supp. 872, 874 (E.D. Ark. 1959); Williams v. Celebrezze, 243 F.Supp. 103, 107 (E.D. Ark. 1965).
 
 
 89
 In Preferred Insurance Co. v. United States, 222 F.2d 942, 947 (9th Cir. 1955), the statute there involved did not provide for a judicial review of administrative action on claims, "but even if it did, administrative findings of fact would have to be accepted by a court unless arbitrary, capricious or without evidentiary support." (emphasis added).
 
 
 90
 Another significant aspect in the present case is that the plaintiffs and the other distributors and manufacturers were not required to recall existing stocks from customers. While it is true that problems of disposition presented themselves, these have been surmounted where a real and hazardous situation existed of significant proportions such as in the nerve gas situation. If Panogen were of the caliber of imminent hazard to the public requiring a suspension order, certainly it would seem that an absolute recall would have been necessary.
 
 
 91
 The present majority opinion asserts that once the district court has inserted itself into the administrative process it becomes wasteful or pointless to return the matter to the agency. I cannot agree. In fact, the preliminary injunction permitted the government to issue its notices of cancellation of the registration after public hearings permitted by the act. Both the order of the district court and our opinion of July 15, 1970 contemplated that all that was being done was that the suspension from the market without hearing was being eliminated but that further hearings on the ultimate question of manufacturing and marketing of this particular product would proceed expeditiously.
 
 
 92
 The present majority opinion also states that the plaintiff's direct and immediate concern is the impact of suspension on their business rather than the claimed danger to farmers and consumers from removal of their product. No doubt this is true although the profit motive is not a dishonorable one in our country. Even if it is true, this makes the detriment of the elimination of the product no less real to the farmers and consumers.
 
 
 93
 It is with regret that I have had to disagree with my brothers of the court but I have done so, and have done so at length, because of my sincere conviction not only that an incorrect result was reached in an individual case but that the case would seem to permit, if not encourage, a type of governmental procedure without hearing which is inconsistent with the protection that we, except in very unusual or emergency situations, attempt to afford to each citizen, no matter how mean or humble he may be.
 
 
 94
 I therefore would affirm the district court's order granting the preliminary injunction.
 
 
 
 Notes:
 
 
 [1]
 "The words `arbitrary and capricious' are a technical legal phrase. They are not used in their popular sense and in this connection have no opprobrious connotation. In the eyes of the law an administrative action not supported by evidence or lacking a rational basis, is deemed arbitrary and capricious. Decisions of administrative officers may not be predicated on their personal desires or views, no matter how sincere they may be, O'Boyle v. Coe, D.C., 155 F.Supp. 581, 584." O'Beirne v. Overholser, 193 F. Supp. 652, 656 (D.D.C.1961)
 
 
 
 95
 SWYGERT, Chief Judge.
 
 
 96
 I concur in Judge PELL'S dissent. Further I adhere to the views expressed in my concurring opinion when a division of this court originally considered and decided the matters presented on this appeal.